1  BRIGGS LAW CORPORATION [BLC file: 243.01]
   Cory J. Briggs (DC Bar no. 464923)
2  99 East "C" Street, Suite 111
   Upland, CA 91786
3  Telephone: 909-949-7115

4  Attorney for Plaintiffs Save Our Heritage Organisation
     and Friends of the U.S.-Mexico Border Environment

5

6

7                    UNITED STATES DISTRICT COURT

8                    FOR THE DISTRICT OF COLUMBIA

9

10  SAVE OUR HERITAGE ORGANISATION and )   CASE NO. 1:07-CV-00308-RCL
    FRIENDS OF THE U.S.-MEXICO BORDER )
11  ENVIRONMENT,                       )
                                       )   **PLAINTIFFS' BRIEF IN
12                       Plaintiffs,   )   OPPOSITION TO DEFENDANTS'
                                       )   MOTION TO DISMISS UNDER
13           vs.                       )   FEDERAL RULE OF CIVIL
                                       )   PROCEDURE 12(b)(6)**
14  ALBERTO R. GONZALEZ, in his official )
    capacity as Attorney General of the United )
15  States; U.S. DEPARTMENT OF JUSTICE; )   Action Filed: February 9, 2007
    MICHAEL CHERTOFF, in his official capacity )
16  as Secretary of the U.S. DEPARTMENT OF )   ** Oral Argument Requested **
    H O M E L A N D   S E C U R I T Y ;   U . S . )
17  DEPARTMENT OF HOMELAND SECURITY; )
    W. RALPH BASHAM, in his official capacity as )
18  Commissioner of the U.S. CUSTOMS AND )
    BORDER PROTECTION; U.S. CUSTOMS )
19  AND BORDER PROTECTION; JULIE L. )
    MYERS, in her official capacity as Assistant )
20  Secretary of Homeland Security for the U.S. )
    I M M I G R A T I O N   A N D   C U S T O M S )
21  ENFORCEMENT; U.S. IMMIGRATION AND )
    CUSTOMS ENFORCEMENT; EMILIO T. )
22  GONZALES, in his official capacity as Director )
    of   the   U.S.   CITIZENSHIP   AND )
23  IMMIGRATION SERVICES; and U.S. )
    CITIZENSHIP   AND   IMMIGRATION )
24  SERVICES,                          )
                                       )
25                       Defendants.   )

26       Plaintiffs Save Our Heritage Organisation and Friends of the U.S.-Mexico Border

27  Environment respectfully submit this brief in opposition to the motion to dismiss filed by

28  Defendants under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

1

**TABLE OF CONTENTS**

2  I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3  II.  Legislative Evolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4  III. Resources at Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5  IV.  Analysis and Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

6      A.   The Secretary of Homeland Security Has No More Statutory Authority
            over the San Diego Barrier, and the Limitations Period Prescribed by the
7           Waiver Legislation Is Inapplicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8           1.   The Secure Fence Act of 2006 Withdrew the Secretary of
                 Homeland Security's Authority to Complete Construction of the
9                San Diego Barrier . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10          2.   The Secretary of Homeland Security's Waiver of Laws Relating to
                 the San Diego Barrier and the 60-Day Limitations Period Are Now
11               Inapplicable to Plaintiffs' San Diego Barrier Claims . . . . . . . . . . . . . 8

12          3.   Plaintiffs' San Diego Barrier Claims Are Timely under the Six-
                 Year Statute of Limitations Applicable to Violations of the
13               Administrative Procedure Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14     B.   The Waiver Legislation Violated Article I of the U.S. Constitution by
            Impermissibly Delegating Legislative Authority from Congress to the
15          Secretary of Homeland Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

16          1.   The Delegation of Legislative Authority from Congress Is
                 Unconstitutional unless Guided by an Intelligible Principle . . . . . . . 11
17
            2.   The Waiver Legislation Contains No Intelligible Principle . . . . . . . . 14
18
            3.   The Breadth of the Waivers for the San Diego and Yuma Barriers
19               Is Unprecedented in the History of the United States . . . . . . . . . . . . 19

20          4.   An Unconstitutional Delegation of the Legislative Function Is No
                 Less Unconstitutional because It Was Delegated to a Branch of
21               Government Sharing Responsibility for National Security and
                 Immigration; Case Law Cited by Defendants Is Distinguishable . . . 22
22
            5.   The Earlier Decision on the Waiver Legislation's Constitutionality
23               by Another District Court, Facing a Different Set of Facts and
                 Circumstances, Should Not Influence this Court's Ruling . . . . . . . . 24
24
   V.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
25

26

27

28

1

## I. INTRODUCTION

2   This motion should be denied.[1]  It rests entirely on two false premises.  The first one is

3   that the Secretary of Homeland Security has the legal authority to proceed with the construction

4   of the San Diego Barrier.  When Congress adopted the Secure Fence Act of 2006, it removed

5   all legal authority for construction of the San Diego Barrier, directing the Secretary to construct

6   barriers and other structures elsewhere along the border.  Thus, the Secretary may no longer

7   proceed with construction of the San Diego Barrier; even if he may, the authority behind the

8   waiver for the San Diego Barrier is gone.  Defendants' motion as it relates to this Barrier should

9   be denied.

10   The second false premise is that the Waiver Legislation is constitutional.  The premise

11   is false because the Waiver Legislation gave insufficient guidance--and hence impermissibly

12   delegated too much of the legislative power ascribed to Congress in Article I of the U.S.

13   Constitution--to the Secretary of Homeland Security when it authorized him to pick and choose

14   what laws to waive.  Consequently, the Secretary's waiver of the laws on which Plaintiffs'

15   claims are based (for the San Diego and Yuma Barriers) provides no lawful grounds for

16   dismissing the claims.  The unconstitutionality of the Waiver Legislation and the Secretary's

17   actions thereunder foil Defendants' motion.

18   Before demonstrating the falsity of the two premises, Plaintiffs will review the evolution

19   of the underlying legislation and then briefly describe the environmental and historic resources

20   that will surely be destroyed in the San Diego and Yuma regions by the Secretary of Homeland

21   Security's unlawful actions.

22

23

## II. LEGISLATIVE EVOLUTION

24   Congress enacted the Illegal Immigration Reform and Immigration Responsibility Act

25   in 1996 ("IIRIRA").  *See* Pub. L. 104-208, 110 Stat. 3009 (8 U.S.C.A. § 1103 note) (Ex. "A"

26

27   _____

    [1]  As noted in the caption for this brief, Plaintiffs request an opportunity for oral

28   argument.  If the request is granted, Plaintiffs ask that the argument be scheduled for sometime
    after June 18, 2007, because Plaintiffs' attorney will be out of the country from May 20 until
    June 10 and has hearings and other court commitments throughout the week of June 11.

1   hereto).  As originally enacted, IIRIRA directed the Attorney General to construct a 14-mile,

2   three-row fence between San Diego and Tijuana, running eastward from the Pacific Ocean

3   ("San Diego Barrier").  *See id.*, § 102(b) (Ex. "A" hereto).  Additionally, Section 102(c) of

4   IIRIRA waived the National Environmental Policy Act and the Endangered Species Act (but

5   no other law) "to the extent the Attorney General determines necessary to ensure expeditious

6   construction of the barriers and roads under this section," including the San Diego Barrier.  *See*

7   Pub. L. 104-208, 110 Stat. 3009, § 102(c) (Ex. "A" hereto).  The Attorney General never made

8   that determination, leaving every law in the country fully applicable to the San Diego Barrier.[2]

9        As Defendants point out, Congress transferred responsibility for building barriers and

10  roads under IIRIRA from the Attorney General to the Secretary of Homeland Security in 2002.

11  *See* Defs.' Opening Br., pp. 3-4.  Three years later, Congress amended the waiver provision in

12  Section 102(c) of IIRIRA.  The new waiver provision in the statute--and the one at issue now--is

13  as follows:

14              (1) In general.  Notwithstanding any other provision of law,
            the Secretary of Homeland Security shall have the authority to
15          waive all legal requirements such Secretary, in such Secretary's
            sole discretion, determines necessary to ensure expeditious
16          construction of the barriers and roads under this section.  Any such
            decision by the Secretary shall be effective upon being published
17          in the Federal Register.

18              (2) Federal court review.

19                  (A) In general.  The district courts of the United
            States shall have exclusive jurisdiction to hear all causes or claims
20          arising from any action undertaken, or any decision made, by the
            Secretary of Homeland Security pursuant to paragraph (1).  A
21          cause of action or claim may only be brought alleging a violation
            of the Constitution of the United States.  The court shall not have
22          jurisdiction to hear any claim not specified in this subparagraph.

23                  (B) Time for filing of complaint.  Any cause or claim
            brought pursuant to subparagraph (A) shall be filed not later than
24          60 days after the date of the action or decision made by the
            Secretary of Homeland Security.  A claim shall be barred unless it
25          is filed within the time specified.

26

27  _____

28     [2] If the determination had been made, nothing in Section 102(c) would have precluded
    judicial review of the determination.

1
2
3

> (C) Ability to seek appellate review. An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

4   *See* Pub. L. 104-208, 110 Stat. 3009-554, *amended by* Pub. L. 109-13, 119 Stat. 306 (8 U.S.C.A.

5   § 1103 note) ("Waiver Legislation" or "Section 102(c)") (Ex. "B" hereto).

6       In 2004, between the transfer of responsibility to the Secretary of Homeland Security and

7   enactment of the Waiver Legislation--that is, while the original waiver provision was still in

8   force--several environmental groups sued the federal government in the Southern District of

9   California over the government's failure to comply with the National Environmental Policy Act

10  ("NEPA") before starting construction of the San Diego Barrier.[3]  While the suit was pending,

11  the Secretary waived NEPA and several other laws applicable to the San Diego Barrier (and

12  involved in this proceeding), including the Coastal Zone Management Act, the Migratory Bird

13  Act, and the National Historic Preservation Act.  *See* 70 Fed. Reg. 55622 (Sept. 22, 2005).  A

14  few months after that waiver, in December 2005, the suit was dismissed as moot because the

15  one law on which it was based had been waived.

16      The following year, Congress enacted the Secure Fence Act of 2006 and added the Yuma

17  Barrier to the list of barriers to be built along the U.S.-Mexico border under Section 102(b) of

18  IIRIRA.  *See* Defs.' Opening Br., pp. 4-5.  One of the most significant aspects of the Act was

19  that it *removed* the mandate for constructing the San Diego Barrier[4] and *replaced* it with a

20  mandate to build five stretches of fence elsewhere: *viz.*, near the Tecate, California point of

21  entry; from the Calexico, California point of entry to Douglas, Arizona (encompassing the

22  Yuma Barrier); from Columbus, New Mexico, to El Paso, Texas; from Del Rio, Texas, to Eagle

23  Pass, Texas; and from Laredo, Texas, to Brownsville, Texas.  *See* Pub. L. 109-367, 120 Stat.

24  2638-2639 (8 U.S.C.A. § 1103 note) (Ex. "C" hereto).

25

26  [3]  NEPA, codified at 42 U.S.C. § 4321 *et seq.*, was the only statute sued over in *Sierra*
27  *Club v. Ashcroft*, U.S. District Court case no. 04-CV-0272 (S. D. Cal. 2005).  Plaintiffs here
    have not asserted any claim based on that statute.

28  [4]  Only about nine of the structure's 14 miles have been built so far.  *See* Defs.' Opening
    Br., p. 5.

1     Not long after the Secure Fence Act took effect, the Secretary of Homeland Security

2 waived the National Historic Preservation Act, the Wilderness Act, and several other

3 environmental and military laws applicable to the Yuma Barrier on January 12, 2007. *See* 72

4 Fed. Reg. 2535 (Jan. 19, 2007). Plaintiffs commenced this proceeding less than a month later.

5

6                              **III. RESOURCES AT RISK**

7     The historic and environmental resources that Plaintiffs aim to protect in this proceeding

8 are irreplaceable. For instance, San Diego's border region is home to natural treasures like the

9 Tijuana River and the Tijuana Estuary, as well as culturally and historically important places

10 like Border Field State Park (part of the internationally renowned Tijuana River National

11 Estuarine Research Reserve) and Smuggler's Gulch. *See* Pls.' Compl., ¶ 2-A.[5] An essential

12 breeding, feeding, and nesting ground and rest stop for more than 370 migratory and native bird

13 species (six being endangered), the Tijuana Estuary is one of southern California's last

14 remaining wetlands ecosystems. *See id.* The Tijuana River and its surroundings are also home

15 to a number of other species on the brink of extinction, including the San Diego fairy shrimp,

16 the San Diego button celery, the least Bell's vireo, the light-footed clapper rail, the California

17 least tern, the California brown pelican, the Quino checkerspot butterfly, and the California

18 gnatcatcher. *See id.* At the southwestern-most point of the United States, Border Field State

19 Park treats equestrians and other visitors to spectacular vistas of the Tijuana Estuary, sunsets

20 over the ocean, and cultural sites on both sides of the border, while nearby Smuggler's Gulch

21 is reported to be one of the many camp sites of Father Junipero Serro, the founder of many of

22 California's first missions. *See id.*

23     The Yuma region's resources are equally priceless. Situated in southwestern Arizona,

24 the region is home to what may be the finest part of the Sonoran Desert, including the Yuma

25 Desert. *See* Pls.' Compl., ¶ 3-A. Yuma's largest eastward neighbor is the Barry M. Goldwater

26

27 ──────────────

28     [5] All factual allegations in Plaintiffs' complaint must be accepted as true for purposes of this motion. *See U.S. v. Gaubert*, 499 U.S. 315, 327 (1991). Citations are to Plaintiffs' original complaint rather than to their amended complaint (*see* n. 7, *infra*).

1    Range, a military installation encompassing the recreation- and resource-rich Sauceda

2    Mountains to the northeast and Copper Mountains to the southwest. *See id.* West of the Range

3    is the Cocopah Indian Reservation; and just beyond that is the Colorado River. *See id.* The

4    Range's southern neighbor is the Cabeza Prieta National Wildlife Refuge, and the Range's

5    southern-most boundary runs almost 40 miles along the U.S.-Mexico border, between the

6    Colorado River and the Refuge. *See id.* The flat-tailed horned lizard--federally listed as a

7    "threatened" species under the Endangered Species Act--migrates between the U.S. and Mexico

8    in the vicinity of the Range.

9        To protect these resources from assured destruction by the San Diego and Yuma Barriers,

10   Plaintiffs now seek declaratory and injunctive relief under the Coastal Zone Management Act

11   (first claim), the National Historic Preservation Act (second and fifth claims), the Migratory

12   Bird Treaty Act (third claim), the Wilderness Act (fourth claim), the National Wildlife Refuge

13   Administration System Act (sixth claim), the Military Lands Withdrawal Act (seventh claim),

14   and the Sikes Act (eighth claim). *See generally* Compl., ¶¶ 13-43.

15

16                        **IV. ANALYSIS AND ARGUMENT**

17       In their brief, Defendants contend that Plaintiffs' challenge to the San Diego Barrier is

18   untimely and that Plaintiffs' claims over the San Diego Barrier and the Yuma Barrier are invalid

19   because all of them are predicated on statutes lawfully waived under the Waiver Legislation.

20   Both contentions assume that the Waiver Legislation is valid, and thus the merits of the motion

21   to dismiss turn in part on the constitutionality of the Waiver Legislation. Defendants concede

22   as much with respect to their second contention, saying that "plaintiffs can only prevail if they

23   . . . demonstrate that the Waiver Legislation itself is unconstitutional." *See* Defs.' Opening Br.,

24   p. 8. On their first contention, however, Defendants are wrong for a variety of reasons.

25       In this section, Plaintiffs will begin by demonstrating that their claims over the San Diego

26   Barrier should not be dismissed. Thereafter, Plaintiffs will take up the broader issue and show

27   that the Waiver Legislation is unconstitutional with respect to the San Diego and Yuma Barriers.

28

A.  The Secretary of Homeland Security Has No More Statutory Authority over the San Diego Barrier, and the Limitations Period Prescribed by the Waiver Legislation Is Inapplicable

Defendants' motion to dismiss Plaintiffs' claims relating to the San Diego Barrier should be denied.  The Secretary of Homeland Security lost his authority to proceed with the Barrier's construction when Congress enacted the Secure Fence Act of 2006 to exclude the Barrier from IIRIRA.  Not only may the Secretary not lawfully go forward with construction, but the waiver and the 60-day limitations period became inapplicable.  Moreover, Plaintiffs' claims are timely because they arise under the Administrative Procedure Act and are therefore subject to a longer statute of limitations.

Each of these reasons is discussed below.

1.  The Secure Fence Act of 2006 Withdrew the Secretary of Homeland Security's Authority to Complete Construction of the San Diego Barrier

Defendants' primary mistake in asking the Court to dismiss Plaintiffs' claims relating to the San Diego Barrier lies in thinking that the Secretary of Homeland Security continues to have the authority to build the Barrier and that the construction is within the scope of barrier-building activities currently prescribed by IIRIRA.  In enacting the Secure Fence Act of 2006, Congress abandoned its plans for completing the San Diego Barrier.

In the beginning, IIRIRA called for the construction of a 14-mile, three-row fence between San Diego and Tijuana, running eastward from the Pacific Ocean.  *See* Pub. L. 104-208, 110 Stat. 3009, § 102(b) (Ex. "A" hereto).  However, the provision requiring the San Diego Barrier's construction was amended by the Secure Fence Act *specifically to exclude* the Barrier.  First, the Act changed the heading of Section 102(b), which previously referred to "FENCING AND ROAD IMPROVEMENTS IN THE BORDER AREA NEAR SAN DIEGO, CALIFORNIA," by deleting "NEAR SAN DIEGO, CALIFORNIA."  *See* Pub. L. 104-208, 110 Stat. 3009-554, *amended by* Pub. L. 109-367, 120 Stat. 2638-2639 (8 U.S.C.A. § 1103 note) (Ex. "C" hereto).  Then the Act amended Section 102(b)(1), which previously called for the San Diego Barrier's construction, by replacing it with a list of five *other* barriers to be built,

1  including the Yuma Barrier; nowhere is the San Diego Barrier mentioned in the amendment.[6]

2  *See id.*  And lest there be any doubt about the desire of Congress to construct five other barriers

3  instead of the San Diego Barrier, one need look no further than the appropriations authorized

4  by Congress: it's the same $12 million that was originally appropriated for the San Diego

5  Barrier back in 1996.  *Cf.* Pub. L. 104-208, 110 Stat. 3009-554 (8 U.S.C.A. § 1103 note) (Ex.

6  "A" hereto); and Pub. L. 109-367, 120 Stat. 2638-2639 (8 U.S.C.A. § 1103 note) (Ex. "C"

7  hereto).  If Congress truly intended to go forward with the San Diego Barrier *and* five other

8  barriers (despite failing to say so), one would have reasonably expected to see some additional

9  funding.

10       By removing the statutory authority for constructing the San Diego Barrier, Congress left

11  the Secretary of Homeland Security with no more authority to build the Barrier.  As such,

12  continuing the San Diego Barrier's construction is legally impossible.  *See, e.g., Ferrell v. U.S.*

13  *Dep't of Housing and Urban Dev.*, 186 F.3d 805, 813-814 (7th Cir. 1999) (holding that statutory

14  amendments to National Housing Act rendered further action under consent decree "statutorily

15  unauthorized" and "constituted a change in the law that has made HUD's continued compliance

16  with [decree] an impossibility").

17       For this reason alone, Defendants' motion for dismissal of Plaintiffs' claims relating to

18  the San Diego Barrier should be denied.[7]

19

20

21

22

---

23   [6] Neither of the two barriers to be built in California encompasses the region where the
24  San Diego Barrier was to have been built. *See* Pls.' Req. for Judicial Notice (filed concurrently
    herewith).

25   [7] Plaintiffs have filed an amended pleading simultaneously with this opening brief in
    order to include a claim based on the Secretary's lack of statutory authority to proceed with the
26  San Diego Barrier's construction.  Plaintiffs may do so under Federal Rule of Civil Procedure
    15(a) because Defendants have not yet served a "responsive pleading."  *See, e.g., McDonald*
27  *v. Hall*, 579 F.2d 120, 121 (1st Cir. 1978) (ruling that motion to dismiss is not responsive
    pleading); *Albany Ins. Co. v. Almacenadora Somex, S.A.*, 5 F.3d 907, 911 (5th Cir. 1993) (same
28  ruling); and *Crum v. Circus Circus Enters.*, 231 F.3d 1129, 1130 n. 3 (9th Cir. 2000) (same
    ruling).

1

2

**2.** <u>The Secretary of Homeland Security's Waiver of Laws Relating to the San Diego Barrier and the 60-Day Limitations Period Are Now Inapplicable to Plaintiffs' San Diego Barrier Claims</u>

3    Not only did the Secretary of Homeland Security lose the authority to proceed with the

4    San Diego Barrier's construction when Congress amended the IIRIRA to exclude the Barrier

5    from the list of barriers to be constructed.  The San Diego Barrier also ceased to be one of the

6    "barriers and roads under this section [*i.e.*, IIRIRA Section 102]."  *See* Pub. L. 104-208, 110

7    Stat. 3009-554 (Ex. "A" hereto), *amended by* Pub. L. 109-13, 119 Stat. 306 (8 U.S.C.A. § 1103

8    note) (Ex. "B" hereto).

9    With the San Diego Barrier no longer one of the "barriers and roads under this section,"

10   the Secretary has no authority to maintain his waiver of laws otherwise applicable to the Barrier.

11   The Waiver Legislation authorizes a waiver only for the "barriers and roads under this section."

12   *See* Pub. L. 109-13, 119 Stat. 306 (8 U.S.C.A. § 1103 note) (Ex. "B" hereto).  The San Diego

13   Barrier is not one of them.

14   By a parity of reasoning, Plaintiffs may assert non-statutory claims against the Secretary

15   of Homeland Security in connection with the San Diego Barrier but are not required to bring

16   such claims within 60 days.  Since the San Diego Barrier is no longer one of the "barriers and

17   roads" covered by the Waiver Legislation, it follows that the Waiver Legislation's prohibition

18   against non-constitutional claims--Section 102(c)(2)(A)--and the 60-day limitations period--

19   Section 102(c)(2)(B)--do not apply to Plaintiffs' claims over the Barrier.  *See* Pub. L. 109-13,

20   119 Stat. 306 (8 U.S.C.A. § 1103 note) (Ex. "B" hereto).

21   Once again, Defendants' motion to dismiss the San Diego Barrier claims should be

22   denied.

23

24

25

**3.** <u>Plaintiffs' San Diego Barrier Claims Are Timely under the Six-Year Statute of Limitations Applicable to Violations of the Administrative Procedure Act</u>

26   Even if the San Diego Barrier were one of the "barriers and roads" currently subject to

27   IIRIRA, Plaintiffs could not have been more clear in stating in their complaint that they are

28   invoking this Court's jurisdiction under the Administrative Procedure Act ("APA"), 5 U.S.C.

1   § 701 *et seq.* *See* Compl., ¶ 8.  Significantly, the limitations period applicable to APA claims

2   is the general six-year period applicable to civil actions against the federal government.  *See* 28

3   U.S.C. § 2401(a); and *Oppenheim v. Campbell*, 571 F.2d 660, 663 (D.C. Cir. 1978) (upholding

4   APA claim brought within limitations period prescribed by 28 U.S.C. § 2401(a) even though

5   related wrongdoing was barred by statute of limitations).  Defendants' motion relating to the

6   timeliness of Plaintiffs' claims concerning the San Diego Barrier overlooks this important point.

7        More fundamentally, even if these claims are subject to the Waiver Legislation's 60-day

8   limitations period, the period is unenforceable if the statute itself is unconstitutional.  Every

9   Congressional enactment "must be based on one or more of its powers enumerated in the

10  Constitution."  *U.S. v. Morrison*, 529 U.S. 598, 607 (2000).  It thus goes without saying that

11  "[a]n unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no

12  protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never

13  been passed."  *Norton v. Shelby County*, 118 U.S. 425, 442 (1886).  More bluntly, "[a]n

14  unconstitutional law is void, and is as no law."  *Ex parte Siebold*, 100 U.S. 371, 376 (1879).

15  And that bedrock principle of our legal system applies just as forcefully today when a

16  limitations-period defense is invoked, such that "the continued enforcement of an

17  unconstitutional statute cannot be insulated by the statute of limitations."  *Virginia Hosp. Ass'n*

18  *v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989) (*aff'd sub nom. Wilder v. Virginia Hosp. Ass'n*, 496

19  U.S. 498 (1990)).

20       Defendants' confusion over Plaintiffs' claims concerning the San Diego Barrier becomes

21  clearest, in light of the foregoing authorities, when one considers what would happen if this

22  Court were to agree that those claims are time-barred but go on to conclude, as part of Plaintiffs'

23  challenge to the Yuma Barrier, that the Waiver Legislation is unconstitutional.  Since the

24  Secretary of Homeland Security's waivers with respect to the San Diego Barrier and the Yuma

25  Barrier are both based on the Waiver Legislation, a conclusion that the law is unconstitutional

26  in the context of the Yuma Barrier would require an identical conclusion with respect to the San

27  Diego Barrier.  The Waiver Legislation cannot be simultaneously unconstitutional (for the

28  waiver pertaining to the Yuma Barrier) and constitutional (for the limitations period barring

1    Plaintiffs' challenge to the San Diego Barrier).  Yet that absurd result is precisely what follows

2    from Defendants' contention that the Waiver Legislation's 60-day limitations period bars

3    Plaintiffs' challenge to the San Diego Barrier, especially in light of Defendants' earlier

4    concession that Plaintiffs will prevail "if they . . . demonstrate that the Waiver Legislation itself

5    is unconstitutional." *See* Defs.' Opening Br., p. 8.

6        Accordingly, Defendants' motion to dismiss Plaintiffs' claims relating to the San Diego

7    Barrier has no merit.

8

9        B.    The Waiver Legislation Violated Article I of the U.S. Constitution by
            Impermissibly Delegating Legislative Authority from Congress to the
10           Secretary of Homeland Security

11       Even if Plaintiffs' San Diego Barrier claims are subject to dismissal, there is good reason

12   for denying Defendants' motion in its entirety.  The Waiver Legislation violated the non-

13   delegation doctrine embodied in Article I of the U.S. Constitution by delegating a distinctively

14   legislative function--deciding what laws should and should not govern construction of the San

15   Diego and Yuma Barriers--to the Secretary of Homeland Security.  Under the Constitution,

16   "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S.

17   CONST. art. I, § 1.  As such, Congress "manifestly is not permitted to abdicate, or to transfer to

18   others, the essential legislative functions with which it is thus vested." *Panama Refining Co.*

19   *v. Ryan*, 293 U.S. 388, 421 (1935).  In this vein, "[t]he repeal of laws is as much a legislative

20   function as their enactment." *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 114

21   (1953).  If, however, Congress wishes to authorize another branch of government to carry out

22   its law-making responsibilities, it can do so only by laying down an "intelligible principle" to

23   which the other branch must conform.  *Hampton v. United States*, 276 U.S. 394, 409 (1928).

24   "[T]he degree of agency discretion that is acceptable varies according to the scope of the power

25   congressionally conferred." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 475 (2001)

26   (upholding Clean Air Act against challenge based on non-delegation doctrine).

27       Significantly, the Secretary of Homeland Security's discretion to pick and choose which

28   laws to waive is not circumscribed by an intelligible principle, thus making the Waiver

1  Legislation as well as the Secretary's two waivers unconstitutional.  The Waiver Legislation
2  simply does not provide enough guidance to the Secretary in exercising his unbridled
3  discretion.[8]

4           1.       The Delegation of Legislative Authority from Congress Is
5                    Unconstitutional unless Guided by an Intelligible Principle

6           A congressional delegation of authority to prescribe what the law should or should not
7  be in a particular circumstance is unconstitutional if not guided by an intelligible principle.  The
8  controlling authorities are *Panama Refining, supra*, and *A.L.A. Schecter Poultry Corporation*
9  *v. United States*, 295 U.S. 495 (1935).  In *Panama Refining*, the President issued an executive
10 order prohibiting the interstate and foreign transportation of petroleum products in excess of the
11 amount permitted by state laws, based on authority granted to him under the National Industrial
12 Recovery Act.  *Panama Refining*, 293 U.S. at 405-406.  In analyzing whether the Act went too
13 far in authorizing the President to prohibit such activities, the Supreme Court first examined the
14 Act's "brief and unambiguous" language.  *Id.* at 415.  The Court quickly concluded that the Act
15 imposed no limitations on Presidential authority--no guiding principles, nothing to qualify his
16 authority, no criteria for acting, no requirement of any finding as a precondition to Presidential
17 action.  *Id*.  The Act did not provide any clarification as to "whether, or in what circumstances
18 or under what conditions, the President is to prohibit the transportation of the amount of
19 petroleum or petroleum products produced in excess of the State's permission."  *Id*.  On that
20 basis, the Court found that the Act gave the President "an unlimited authority to determine the
21 policy and to lay down the prohibition, or not lay it down, as he may see fit."  *Id*.  Next the

22
23
24 ---
        [8]  Citing no legal authority whatsoever, Defendants attempt (in footnote 6 of their
opening brief) to distinguish between a "repeal" and a "waiver."  The intended implication is
clear: since the Waiver Legislation authorizes a law's "waiver" but not its "repeal," it does not
25 unconstitutionally delegate the law-making function to the Secretary of Homeland Security.
The distinction, however, is mere wordplay.  Whether Congress repeals a particular statute as
26 it relates to the San Diego and Yuma Barriers or authorizes the Secretary to waive the statute
has the same result: the law is inapplicable.  The difference, for purposes of the Constitution,
27 is that Congress may repeal a law for any reason whatsoever, whereas the Secretary may waive
a law only in accordance with an intelligible principle.  Whether there is such a principle in the
28 Waiver Legislation is precisely the issue here, and Defendants' attempted distinction between
"repeal" and "waiver" is unavailing.

1    Court examined other parts of the Act, *see id.* at 416-420, concluding that none of them

2    provided any grounds for controlling or limiting the "broad grant of authority in [the Act]." *Id.*

3    at 416.  In the end, the Court held that the Act unconstitutionally delegated legislative power

4    to the President because Congress "declared no policy, established no standard, laid down no

5    rule.  There is no requirement, no definition of circumstances and conditions in which the

6    transportation is to be allowed or prohibited." *Id.* at 430.

7         Even when a statute proclaims some policy or restriction on the exercise of delegated

8    authority, the statute is unconstitutional if the policies and restrictions are too general or too

9    broad to impose any actual limitations.  In *Schechter Poultry*, the President promulgated a "Live

10   Poultry Code" pursuant to authority granted to him under the National Industrial Recovery Act

11   (not the same part at issue in *Panama Refining*).  Despite several apparent prerequisites to be

12   met by the President before exercising his authority under the Act--*e.g.*, finding that groups

13   proposing provisions for inclusion in the code "impose[d] no inequitable restrictions on

14   admission to membership" and that the code was not "designed to promote monopolies or to

15   eliminate or oppress small enterprises"--the Court concluded that these "restrictions leave

16   virtually untouched the field of policy envisaged by [the Act], and, in that wide field of

17   legislative possibilities, the proponents of a code, refraining from monopolistic designs, may

18   roam at will and the President may approve or disapprove their proposals as he may see fit."

19   *Schechter Poultry, supra*, 295 U.S. at 538.  In addition, while the President was required to find

20   that the code will "tend to effectuate the policy of [the Act]," the Court observed that this

21   requirement was merely "*called* a finding;" in fact, the so-called finding was "really but a

22   statement of an opinion as to the general effect upon the promotion of trade or industry of a

23   scheme of laws." *Id.* (emphasis added).  Moreover, the Act authorized the President to impose

24   additional conditions that "in his discretion" he deemed "necessary" to effectuate general

25   policies such as "rehabilitation and expansion of trade," thereby bestowing on him an

26   "unfettered discretion." *Id.* at 538-539.  Thus, the Court held that the Act, given its "broad

27   declaration" of policy and the "nature of the few restrictions that are imposed," granted

28

1    "virtually unfettered" discretion to the President and "conferred . . . an unconstitutional

2    delegation of legislative power." *Id*. at 541-542.

3          In contrast, statutes that contain specific standards to guide how the commands of

4    Congress are to be carried out do not violate the Constitution.  For example, in *Sunshine*

5    *Anthracite Coal Company v. Adkins*, 310 U.S. 381 (1940), the Bituminous Coal Act easily

6    passed the intelligible-principle test.  The Act proposed to stabilize the bituminous coal industry

7    primarily through price-fixing and eliminating unfair competition, and it delegated this

8    responsibility to the National Bituminous Coal Commission. *Id.* at 387.  The Act enumerated

9    several specific standards for fixing minimum prices, such as computing the average cost for

10   each minimum-price area, classifying the various sizes and grades of coal to reflect relative

11   market values, and coordinating minimum prices. *Id.* at 397.  The Supreme Court found there

12   to be no unconstitutional delegation of authority, holding that the standards "far exceed in

13   specificity others which have been sustained . . . [and] in the hands of experts . . . are wholly

14   adequate for carrying out the general policy and purpose of the Act." *Id.* at 398.

15          Similarly, in *Mistretta v. United States*, 488 U.S. 361 (1989), a delegation of authority

16   to the Sentencing Commission was upheld as constitutional because, although the Commission

17   was granted discretion in its task of reforming the sentencing guidelines, the statute identified

18   the specific methods, guidelines, and limitations to be followed by the Commission in carrying

19   out the will of Congress. *See id.* at 377.  Not only did the statute specify the goals and purposes,

20   it also prescribed boundaries for the Commission to respect in promulgating new sentencing

21   guidelines; in particular, the statute directed the Commission to employ a system of guidelines

22   and use current average sentences as a "starting point," required sentencing ranges to be

23   consistent with other pertinent provisions of the U.S. Code, and limited the maximum range of

24   imprisonment. *Id*. at 374-375.  Additionally, the statute required the Commission to consider

25   various specific factors in formulating offense categories--such as the nature and degree of the

26   harm caused, the public concern raised, and the deterrent effect of the sentencing--as well as

27   categories of defendants--including categories based on age, education level, employment

28   histories, and family responsibilities. *Id*. at 375-76.  With so much guidance found within the

express language of the statute, the Supreme Court had "no doubt" that the delegation of authority to the Commission was "sufficiently specific and detailed to meet constitutional requirements." *Id*. at 374.

Most recently, in *American Trucking Associations, supra*, 531 U.S. 457, the Supreme Court had to decide whether the Clean Air Act unconstitutionally delegated legislating authority to the Administrator of the Environmental Protection Agency. *Id.* at 462. The precise issue was whether the Act's requirement that the Administrator set national ambient air quality standards for pollutants at a level "requisite to protect the public health" violated the non-delegation doctrine. *Id.* at 472. The Court initially rejected the notion that an unconstitutional statute could be cured through a narrow interpretation:

> The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory. The very choice of which portion of the power to exercise--that is to say, the prescription of the standard that Congress had omitted--would *itself* be an exercise of the forbidden legislative authority.

*Id.* at 473 (emphasis in original). Despite that admonition, the Court went on to agree with the Solicitor General that there was an intelligible principle insofar as the Act required the Administrator to set standards for air quality "based on published air quality criteria that reflect the latest scientific knowledge." *Id.* For that reason, the Court held that the Act contained an intelligible principle that limited the Administrator's exercise of discretion in setting limits on air pollutants. *Id.* at 474.

## 2.    The Waiver Legislation Contains No Intelligible Principle

The Waiver Legislation does not meet the intelligible-principle test because it contains only the vaguest of standards to guide the Secretary of Homeland Security in exercising his discretion to waive any law. The standard is: "necessary to ensure expeditious construction of the barriers and roads under this section." *See* Pub. L. 109-13, 119 Stat. 306 (8 U.S.C.A. § 1103 note) (Ex. "B" hereto). According to the Supreme Court, such legislation offends the Constitution.

1    The defects in the Waiver Legislation are much worse than those identified in *Panama*

2  *Refining*.  At least in that case there was a "general outline of policy" to guide the President,

3  even though it "contain[ed] nothing as to the circumstances or conditions in which

4  transportation of petroleum or petroleum products should be prohibited.  *See Panama Refining,*

5  *supra*, 293 U.S. at 417.  As for the Waiver Legislation, there is no outline of policy--only an

6  amorphous goal of "expeditious construction" of roads and barriers everywhere along the U.S.

7  border.  *See* Pub. L. 109-13, 119 Stat. 306 (8 U.S.C.A. § 1103 note) (Ex. "B" hereto).  Further,

8  the Supreme Court was unpersuaded by the "deleterious consequences" that would follow if the

9  President did not act as he did under the statute:

10              The Congress did not prohibit that transportation [of excess oil] .
               . . did not say that transportation of that oil was 'unfair
11             competition' . . . did not declare in what circumstances that
               transportation should be forbidden, or require the President to make
12             any determination as to any facts or circumstances.  Among the
               numerous and diverse objectives broadly stated, the President was
13             not required to choose . . . was not required to ascertain and
               proclaim the conditions prevailing in the industry which made the
14             prohibition necessary.  The Congress left the matter to the
               President without standard or rule, to be dealt with as he pleased.
15

16  *Panama Refining, supra*, 293 U.S. at 418.  Similarly, concerns about illegal immigrants and

17  terrorists entering this country are no substitute here for the intelligible principle that Congress

18  was obligated to articulate if it intended for there to be a lawful delegation in the Waiver

19  Legislation.  *Id.*  Nor will the principle materialize from an "ingenious and diligent

20  construction" of the Waiver Legislation, since allowing such a construction "still permits such

21  a breadth of authorized action as essentially to commit to the [Secretary of Homeland Security]

22  the functions of a legislature rather than those of an executive or administrative officer

23  executing a declared legislative policy."  *Id.*  Even the Secretary's sincere motives in acting for

24  the public good cannot save the Waiver Legislation: "The point is not one of motives but of

25  constitutional authority, for which the best of motives is not a substitute."  *Id.* at 420.

26      The Waiver Legislation's constitutional defects bear a striking resemblance to those

27  identified in *Schechter Poultry*.  In that case, despite the President's having to make a finding

28  that the Live Poultry Code "impose[d] no inequitable restrictions on admission to membership"

1  and was not "designed to promote monopolies or to eliminate or oppress small enterprises," the

2  Supreme Court concluded that the "restrictions leave virtually untouched the field of policy

3  envisaged by [the authorizing statute]." *Schechter Poultry, supra*, 295 U.S. at 538.  Moreover,

4  the so-called "finding" that the President had to make was "really but a statement of an opinion

5  as to the general effect upon the promotion of trade or industry of a scheme of laws." *Id.*  The

6  same is true of the Waiver Legislation, with its single requirement that the Secretary of

7  Homeland Security, in waiving whatever laws he chooses, determines the waiver to be

8  "necessary to ensure expeditious construction" of roads and fences along the border; without

9  specific guidance from Congress, his determination is, as in *Schechter Poultry*, "really but a

10  statement of [his] opinion as to the general effect upon [the construction of border roads and

11  fences] of a scheme of laws." *Cf. id.*  And, just as in *Schechter Poultry*, where the President's

12  exercise of discretion based on what he deemed "necessary" to give effect to general policies

13  like "rehabilitation and expansion of trade" bestowed upon him a "virtually unfettered"

14  discretion, the Secretary of Homeland Security's determination as to the laws that he and he

15  alone *thinks* are an impediment to "expeditious construction" of roads and fences is similarly

16  the product of unfettered discretion and therefore unconstitutional.  *Cf. id.* at 538-542.

17      At the same time, the Waiver Legislation has nothing in common with statutes that have

18  passed the intelligible-principle test.  For example, the Supreme Court held that the Bituminous

19  Coal Act's enumeration of *specific standards* for fixing prices--computing average cost for each

20  minimum-price area, classifying various sizes and grades of coal to reflect relative market

21  values, and coordinating minimum prices--were constitutionally sufficient.  *See Sunshine*

22  *Anthracite Coal Co., supra*, 310 U.S. at 397-398.  The Waiver Legislation contains no

23  comparable standards.  The Court also ruled that the authority delegated by statute to the

24  Sentencing Commission to reform the federal government's sentencing guidelines was

25  "*sufficiently specific and detailed* to meet constitutional requirements"; the statute prescribed

26  a "starting point," required sentencing ranges to fit with other federal statutes, set limits on the

27  length of sentences, and required consideration of the age, educational level, work histories, and

28  family responsibilities of defendants.  *See Mistretta, supra*, 488 U.S. at 374-376 (emphasis

added).  The Waiver Legislation contains no comparable standards.  The Court subsequently upheld a challenge to the Clean Air Act's delegation of authority to the Administrator of the Environmental Protection Agency because air-pollution limits set by her were verifiably *objective*--that is, "based on published air quality criteria that reflect the latest scientific knowledge."  *See American Trucking Ass'ns, supra*, 531 U.S. at 473.  Again, the Waiver Legislation contains no comparable standards.

Unlike the statutes at issue in those three Supreme Court cases, nothing in the Waiver Legislation identifies the limits that Congress meant to impose on the Secretary of Homeland Security's exercise of discretion; it is impossible to discern what was meant by the phrase "necessary to ensure expeditious construction" because the Waiver Legislation contains no deadlines, no model schedule for construction, no hint as to what Congress considered to be a *reasonable* delay.[9]  Unlike all three cases, the Waiver Legislation imposes no requirement that the Secretary make his determination based on *objective* data; for example, he need not compare the pace of construction on roads and barriers to comparable federal projects in order to determine whether any particular law is in fact actually holding up construction of the roads and barriers.  In other words, unlike all three cases, here Congress failed to articulate any intelligible principle to guide the Secretary in deciding which laws to waive.  Given the unlimited discretion conferred upon the Secretary to waive every law in the country, Congress was derelict in not setting specific limits on how he may exercise his discretion.  *See American Trucking Ass'ns, supra*, 531 U.S. at 475 (explaining that "degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred").

Indeed, the unconstitutionality of the Waiver Legislation is evident from a comparison of its original and current versions.  There was no unlawful delegation of the legislative function under the original version because Congress *itself* decided to waive two laws--the National Environmental Policy Act and the Endangered Species Act--subject only to the Attorney

---

[9]  Congress expressed its "sense" that completing the San Diego Barrier should be a "priority for the Secretary."  *See* 6 U.S.C. § 256.  However, Congress has not expressed a similar sentiment over the Yuma Barrier, and more importantly did not articulate what it considers to be a reasonable timetable for finishing the San Diego Barrier.

1   General's determination that the waiver was "necessary to ensure expeditious construction of

2   the roads and barriers under this section."   Under the current version, however, Congress has

3   made no decision about what laws should and should not be waived.   That decision was

4   delegated--unconstitutionally--to the Secretary of Homeland Security.

5        Furthermore, the "expeditious construction" language in the Waiver Legislation provides

6   no meaningful guidance to the Secretary of Homeland Security.  If that language is to provide

7   any guidance and establish any boundaries--that is, if it is to be dispositive here--there must be

8   some conduct that it rules out, that it prohibits.   But that is where Defendants' argument

9   unravels.  Common sense dictates that every act of Congress is to be carried out as quickly as

10  possible to achieve the act's purposes; nobody could seriously argue that acts of Congress are

11  to be carried out "eventually" or "when folks get around to it" in the absence of language

12  requiring expeditious achievement of the act's goals.  Defendants believe that the "expeditious

13  construction" language provides the intelligible principle, even though acts of Congress by their

14  very nature do not allow foot-dragging, whether they explicitly forbid it or not.

15       Similarly, if the "expeditious construction" language really does express an intelligible

16  principle, why has it taken so long to build the San Diego Barrier?  This language in the Waiver

17  Legislation is identical to the language in the original version.   In the nine years between the

18  original version's enactment (1996) and its amendment (2005), the San Diego Barrier was not

19  finished and today is not expected to be completed until 2011.  *See* Defs.' Opening Br., pp. 5-6.

20  Meanwhile, the Yuma Barrier is expected to be completed later this year.  *See id.*, p. 6.  How

21  can the "expeditious construction" language express anything intelligible when, according to

22  Defendants, it compels the Secretary to finish the 37-mile Yuma Barrier within the next seven

23  months but gives him four more years to complete less than half of the 14-mile San Diego

24  Barrier?  The language is not the intelligible principle that Defendants think it is.

25       Consistent with this analysis, the Waiver Legislation is so vague that the Secretary of

26  Homeland Security could not help but misapply his authority under it and ended up over-

27  reaching.  The Waiver Legislation authorizes waivers "to ensure expeditious *construction* of the

28  barriers and roads under this section."  *See* Pub. L. 109-13, 119 Stat. 306 (8 U.S.C.A. § 1103

1 note) (Ex. "B" hereto) (emphasis added). Nowhere does the Waiver Legislation authorize

2 waivers for the purpose of *post-construction maintenance*. Meanwhile, the waivers do just that:

3 they extend beyond construction to the "upkeep" of the San Diego and Yuma Barriers. *See* 70

4 Fed. Reg. at 55623, col. 2 (stating that waiver includes "upkeep of fences, roads, supporting

5 elements" etc.); and 72 Fed. Reg. at 2535, col. 3 (stating that waiver includes "upkeep of fences,

6 roads, supporting elements" etc.). If Congress had intended for the Waiver Legislation to cover

7 post-construction activities, all it had to do was say so. That omission and the scope of the

8 Secretary's waiver together speak volumes about the Waiver Legislation's unconstitutionality

9 due to its lack of an intelligible principle.

10        In sum, nothing in the Waiver Legislation can reasonably be construed as articulating an

11 intelligible principle to guide the Secretary of Homeland Security in selecting which laws

12 should have been waived.

13

14        3.        The Breadth of the Waivers for the San Diego and Yuma Barriers
                    Is Unprecedented in the History of the United States

15        Despite extensive research, Plaintiffs have been unable to identify a single instance in

16 which a member of the Executive Branch, from the President on down, has been authorized by

17 Congress to waive the application of one or more *unspecified* laws as the member so chooses.

18 IIRIRA itself provides plenty of examples of Congressional authorization to waive the

19 application of a specified legal requirement. Consider a few examples (the list is not even close

20 to being exhaustive):

21              •        The Attorney General may waive the prohibition against
22                       admission of an immigrant who is or has been a member of
                         a totalitarian party. *See* 11 U.S.C. § 1182(a)(3)(D)(iv).

23              •        The Attorney General may waive the prohibition against
24                       admission of an alien unlawfully present in the country. *See*
                         11 U.S.C. § 1182(a)(9)(B)(v).

25              •        The Secretary of Homeland Security may waive the
26                       prohibition against admission of certain aliens (victim of
                         violence against women) entering or attempting to enter the
27                       country without proper admission. *See* 11 U.S.C. §
                         1182(a)(9)(C)(iii).

28

- • The Secretary of State may waive certain <u>visa-related requirements for a particular alien or class of aliens</u>. *See* 11 U.S.C. § 1182(b)(2).

- • The Attorney General may waive the <u>prohibition against admission of an immigrant with health-related problems</u>. *See* 11 U.S.C. § 1182(g).

- • The Attorney General may waive the <u>prohibition against admission of an immigrant with a crime-related background</u>. *See* 11 U.S.C. § 1182(h).

Of course, narrowly specified waivers like these are not confined to IIRIRA. Congress has authorized similar waivers under other statutory regimes. Examples include (again not exhaustively):

- • The Secretary of Labor may waive the <u>claim-submission requirements for work-related injuries</u>. *See* 5 U.S.C. § 8121.

- • The Secretary of Homeland Security may waive <u>the prohibition against reducing the Coast Guard's missions or capability to perform its missions</u>. *See* 6 U.S.C. § (e)(2).

- • The Secretary of Agriculture may waive <u>the matching-funds requirement for federal cooperative extension funds</u>. *See* 7 U.S.C. § 343(e)(4)(B).

- • The Secretary of Defense may waive <u>the citizenship requirements for commissioned officers</u>. *See* 10 U.S.C. § 532(f).

- • The Secretary of Commerce may waive <u>the requirement that fish harvested under a particular program be processed on U.S. vessels or U.S. soil</u>. *See* 16 U.S.C. § 1853a(c)(2).

What Congress appears never to have done is give the Executive Branch the authority to waive *any* law under the sun. But that is precisely what Congress did when it enacted the Waiver Legislation without putting any limits on the Secretary of Homeland Security's waiver authority. If adhering to the law requiring open- and competitive-bidding procedures for government contracts will slow down completion of the San Diego and Yuma Barriers, what is there to stop the Secretary from waiving that law? How about the law regulating the disposal of hazardous waste? Or the law establishing minimum standards for workplace safety? Or the law prohibiting the use of child labor?

1      By failing to identify the specific legal requirements that are subject to waiver by the

2 Secretary of Homeland Security--unlike in the original version of the Waiver Legislation[10]--

3 Congress has left it to the Secretary alone to determine how much of the legislative function he

4 should exercise.  Yet that is *precisely* what makes the Waiver Legislation unconstitutional.  In

5 the Supreme Court's words: "The very choice of which portion of the power to exercise--that

6 is to say, the prescription of the standard that Congress had omitted--would *itself* be an exercise

7 of the forbidden legislative authority."  *See American Trucking Associations, supra*, 531 U.S.

8 at 473 (emphasis in original).  The Secretary cannot possibly decide which laws to waive and

9 which ones to keep without making the very choice that, under Supreme Court precedent, is the

10 sole responsibility of Congress.

11      That there is no precedent for a delegation of the legislative function at issue here is

12 particularly notable in light of a Supreme Court case cited on page 13 of Defendants' opening

13 brief.  In *Zemel v. Rusk*, 381 U.S. 1 (191965), the appellant challenged the Passport Act of 1926

14 after the Secretary of State refused to validate appellant's passport for travel to Cuba.  *Id.* at 3-4.

15 The Act provided simply this: "The Secretary of State may grant and issue passports . . . under

16 such rules as the President shall designate and prescribe for and on behalf of the United States."

17 *Id.* at 7-8.  The Court nevertheless rejected the challenge because, under the Act's broad

18 language, "the Executive has several times in the recent past openly asserted the power to

19 impose such [travel] restrictions under predecessor statutes containing substantially the same

20 language."  *Id.* at 9.  As shown above, however, no other statute contains the sort of broad

21 language found in the Waiver Legislation.  Under *Zemel*, Defendants cannot point to any

22 instance of the Executive Branch's lawful exercise of the sort of power given to the Secretary

23 in this case: namely, the power to waive *any* law.

24

25

26

27

28      [10] As mentioned earlier in this brief, the two statutes subject to waiver were the National Environmental Policy Act and the Endangered Species Act.

1    Accordingly, the lack of precedent for not specifying the limits of an Executive Branch

2  member's waiver authority is further evidence that the Waiver Legislation is contrary to the

3  Constitution.[11]

4

5          4.    An Unconstitutional Delegation of the Legislative Function Is No
                  Less Unconstitutional because It Was Delegated to a Branch of
6                 Government Sharing Responsibility for National Security and
                  Immigration; Case Law Cited by Defendants Is Distinguishable

7    Toward the end of their brief, Defendants cite several cases in support of the proposition

8  that the Waiver Legislation is constitutional because it "relates to matters of both foreign affairs

9  and national security, areas over which the Executive Branch independently maintain [sic]

10  significant constitutional authority." *See* Defs.' Opening Br., pp. 12-14. Defendants' argument

11  seems to be that the Executive Branch's authority over foreign affairs and national security

12  effectively cures the Waiver Legislation's constitutional infirmities.    Defendants have

13  misunderstood the cases they cited and have exaggerated the extent of the Executive Branch's

14  authority.   In particular, none of the cases considers the extent to which the Executive Branch's

15  authority over foreign affairs and national security cures an otherwise unconstitutional

16  delegation of the legislative function for activities taking place *wholly inside* the U.S. and

17  conducted based on authority *shared* with Congress.

18    Four of Defendants' cases are distinguishable because they deal with federal powers

19  assigned to the Executive Branch alone.  In *United States v. Curtiss-Wright Export Corporation*,

20  299 U.S. 304 (1936), a case involving criminal indictments alleging the unlawful sale of

21  munitions to Bolivia, the Supreme Court's analysis emphasized the Executive Branch's

22  exclusive authority in the realm of foreign affairs; notably, it did so only after differentiating

23  the government's authority over external *vis-à-vis* internal affairs. *Id.* at 315-316, 319-320.  In

24  *Department of the Navy v. Egan*, 484 U.S. 518 (1988), the Supreme Court ruled that courts may

25

26    _____

27    [11]   Such unprecedented, unrestricted authority raises further red flags insofar as the
       Waiver Legislation does not require the Secretary to consult with the Attorney General before
28    waiving a single law, even though the Attorney General has the last word on "all questions of
       law" arising from the Secretary's administration and enforcement of IIRIRA.  *See* 8 U.S.C. §
       1103(a)(1).

1    not review security-clearance denials owing to the President's unique status as Commander in

2    Chief. *Id.* at 527-529. The Court of Appeals in *People's Mojahedin Organization of Iran v.*

3    *U.S. Department of State*, 182 F.3d 17 (1999), refused to review the Secretary of State's

4    findings about "foreign [terrorist] organizations" because the findings involved political,

5    foreign-policy decisions to be made by the Executive Branch rather than the Judiciary. *Id.* at

6    21-23. Lastly, in *Loving v. United States*, 517 U.S. 748 (1996), the Supreme Court upheld the

7    President's authority, upon delegation by Congress, to establish aggravating factors for capital

8    crimes committed by members of the armed forces. *Id.* at 769. The Court so ruled not only

9    because the delegation was made within boundaries that the President could not exceed, but also

10   because the delegation was made to the President as Commander in Chief. *Id.* at 772.

11       Defendants' choice of quotes from *Knauff v. Shaughnessy*, 338 U.S. 537 (1950), is

12   curious because of what was omitted. The Supreme Court indeed said that excluding aliens "is

13   a fundamental act of *sovereignty*"--that is, within the *joint* province of Congress and the

14   Executive Branch. *Id.* at 542 (emphasis added). Significant, however, is the Court's distinction

15   between the rules governing deportation of persons already inside the country and the rules

16   governing exclusion of aliens outside the country. *Id.* at 543. *Cf. U.S. v. Valenzuela-Bernal*,

17   485 U.S. 858, 864 (1982) (noting that *Congress*, in exercising its "plenary power" over

18   admission of aliens, has adopted "policy of apprehending illegal aliens at or near the border and

19   deporting them promptly").

20       In this connection, Congress, as opposed to the Executive Branch, has been assigned the

21   responsibility to make rules and regulations governing property owned by the federal

22   government. *See* U.S. CONST. art. 4, § 3. The San Diego and Yuma Barriers are being

23   constructed on property (soon to be if not already) owned by the federal government. *See* Pub.

24   L. 104-208, 110 Stat. 3009-554, *amended by* Pub. L. 109-13, 119 Stat. 306 (8 U.S.C.A. § 1103

25   note), § 102(b)(2) (Ex. "B" hereto) (requiring acquisition of easements needed to carry out

26   construction of barriers). The laws waived by the Secretary of Homeland Security govern

27   activities taking place on federal property. As a member of the Executive Branch, the Secretary

28   has no special authority over the property *inside the U.S.* on which the San Diego and Yuma

1  Barriers are being built.  The power exercised by the Secretary to erect the Barriers inside the

2  U.S. is not nearly as broad as the power exercised by the Executive Branch to prevent aliens

3  from entering the U.S. in the first place, notwithstanding that the outcome may be the same.

4      The upshot is that even the Executive Branch's independent authority over national

5  security and foreign affairs, including immigration, cannot ameliorate the Waiver Legislation's

6  unconstitutional delegation of the legislative function to the Secretary of Homeland Security.

7  As the Supreme Court pointed out in *Loving*, if the delegation called for "the exercise of

8  judgment or discretion that lies beyond the traditional authority of the President, Loving's last

9  argument that Congress failed to provide guiding principles to the President might have more

10  weight." *Loving, supra*, 517 U.S. at 772.  The weight of Plaintiffs' argument is overwhelming

11  here: picking and choosing--from among all the laws on the books--which ones the federal

12  government will follow and which ones it will ignore is not within the Executive Branch's (and,

13  by inclusion, the Secretary's) traditional authority over foreign affairs or national security.  The

14  Executive Branch shares its authority over in-the-U.S., immigration-related activities with

15  Congress.

16      Overall, the broad, exclusive authority that Defendants seek to use to give the Waiver

17  Legislation a shot of constitutionality simply does not go far enough.

18

19          5.    The Earlier Decision on the Waiver Legislation's Constitutionality
                  by Another District Court, Facing a Different Set of Facts and
20                Circumstances, Should Not Influence this Court's Ruling

21      As Defendants noted in their opening brief, the U.S. District Court for the Southern

22  District of California issued a decision upholding the Waiver Legislation against constitutional

23  attack and the decision was not appealed.  Nonetheless, it should not be followed.

24      First and foremost, the decision is not binding on this Court.  *See, e.g., U.S. v.

25  Drummond*, 98 F. Supp. 2d 44, 50 n. 5 (D.D.C. 2000) (noting that decisions by other district

26  courts are not binding but merely persuasive).

27      Next, in that decision "it [was] significant that plaintiff's [*sic*] Complaint relies solely

28  on [the National Environmental Policy Act] to state their claims.  Congress did not revoke its

1   prior express authorization that NEPA could be waived. . . . * * * Thus, the Waiver Legislation

2   effected no change in the already plenary scope of the delegated discretion to waive NEPA

3   provisions that existed before plaintiffs filed their Complaint in this case." *See* Order

4   Dismissing Case, p. 8 (p. 9 of item 4 submitted with Defendants' Motion to Dismiss).  In other

5   words, the new version of the Waiver Legislation did not make it unconstitutional with respect

6   to NEPA because Congress had already expressed its desire to waive it; put another way, the

7   policy question about what laws should and should not apply to the San Diego Barrier had been

8   answered by Congress itself.  Here, in contrast, none of Plaintiffs' claims is based on NEPA and

9   none was waived by Congress in either version of the Waiver Legislation.

10          Finally, that decision predated the Yuma Barrier's waiver.  To the extent the second

11  waiver may affect the Court's analysis of the constitutional issues raised here, the earlier

12  decision by a sibling court presented with only a fraction of the facts should not influence this

13  Court.

14                                        *     *     *

15          In the second half of this section, Plaintiffs have shown that the Waiver Legislation is

16  unconstitutional because of its lack of an intelligible principle limiting the Secretary of

17  Homeland Security's discretion in deciding what laws to waive and what laws to follow.  Such

18  a broad delegation of the legislative function is unprecedented in the country's history and no

19  less illegal simply because Congress and the Executive Branch share authority over matters of

20  national security and immigration.  Whatever the Secretary may try to do under the Waiver

21  Legislation in order to avoid trespassing into the exclusive legislative domain of Congress will

22  "*itself* be an exercise of the forbidden legislative authority."  *See American Trucking Ass'ns,*

23  *supra*, 531 U.S. at 473 (emphasis in original).

24

25

26

27                                  **V.  CONCLUSION**

28

1    For all these reasons, Plaintiffs respectfully urge the Court to deny Defendants' motion

2  to dismiss this case.

3

4    Date: May 7, 2007.                    Respectfully submitted,

5                                          BRIGGS LAW CORPORATION

6

7                          By:    ____/s/_____
8                                 Cory J. Briggs

9                                 Attorney for Plaintiffs Save Our Heritage
                                  Organisation and Friends of the U.S.-
10                                Mexico Border Environment

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiffs' Brief in Opposition to Defendants
Motion to Dismiss etc.**

Exhibit "A"

104 P.L. 208, *101x9; 110 Stat. 3009, **3009x553;
1996 Enacted H.R. 3610; 104 Enacted H.R. 3610

(a) INCREASED NUMBER OF BORDER PATROL AGENTS.—The Attorney General in each of fiscal years 1997, 1998, 1999, 2000, and 2001 shall increase by not less than 1,000 the number of positions for full-time, active–duty border patrol agents within the Immigration and Naturalization Service above the number of such positions for which funds were allotted for the preceding fiscal year.

(b) INCREASE IN BORDER PATROL SUPPORT PERSONNEL.—The Attorney General, in each of fiscal years 1997, 1998, 1999, 2000, [**3009x554] and 2001, may increase by 300 the number of positions for personnel in support of border patrol agents above the number of such positions for which funds were allotted for the preceding fiscal year.

(c) DEPLOYMENT OF BORDER PATROL AGENTS.—The Attorney General shall, to the maximum extent practicable, ensure that additional border patrol agents shall be deployed among Immigration and Naturalization Service sectors along the border in proportion to the level of illegal crossing of the borders of the United States measured in each sector during the preceding fiscal year and reasonably anticipated in the next fiscal year.

(d) FORWARD DEPLOYMENT.—

(1) IN GENERAL.—The Attorney General shall forward deploy existing border patrol agents in those areas of the border identified as areas of high illegal entry into the United States in order to provide a uniform and visible deterrent to illegal entry on a continuing basis. The previous sentence shall not apply to border patrol agents located at checkpoints.

(2) PRESERVATION OF LAW ENFORCEMENT FUNCTIONS AND CAPABILITIES IN INTERIOR STATES.— The Attorney General shall, when deploying border patrol personnel from interior stations to border stations, coordinate with, and act in conjunction with, State and local law enforcement agencies to ensure that such deployment does not degrade or compromise the law enforcement capabilities and functions currently performed at interior border patrol stations.

(3) REPORT.—Not later than 6 months after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on—

(A) the progress and effectiveness of the forward deployment under paragraph (1); and

(B) the measures taken to comply with paragraph (2).

 [*102x9]  SEC. 102. <8 USC 1103 note> IMPROVEMENT OF BARRIERS AT BORDER.

(a) IN GENERAL.—The Attorney General, in consultation with the Commissioner of Immigration and Naturalization, shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

(b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS IN THE BORDER AREA NEAR SAN DIEGO, CALIFORNIA.—

(1) IN GENERAL.—In carrying out subsection (a), the Attorney General shall provide for the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences.

(2) PROMPT ACQUISITION OF NECESSARY EASEMENTS.—The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

 [**3009x555] (3) SAFETY FEATURES.—The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

(4) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subsection not to exceed $12,000,000. Amounts appropriated under this paragraph are authorized to remain available until expended.

(c) WAIVER.—The provisions of the Endangered Species Act of 1973 and the National Environmental Policy Act

104 P.L. 208, *102x9; 110 Stat. 3009, **3009x555;
1996 Enacted H.R. 3610; 104 Enacted H.R. 3610

of 1969 are waived to the extent the Attorney General determines necessary to ensure expeditious construction of the barriers and roads under this section.

(d) LAND ACQUISITION AUTHORITY.—

(1) IN GENERAL.—Section 103 (8 U.S.C. 1103) is amended—

(A) by redesignating subsections (b), (c), and (d) as subsections (c), (d), and (e), respectively; and

(B) by inserting after subsection (a) the following:

"(b)(1) The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this Act.

"(2) The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to the Act of August 1, 1888 (Chapter 728; 25 Stat. 357).

"(3) When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to the Act of August 1, 1888 (Chapter 728; 25 Stat. 357).

"(4) The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).".

(2) CONFORMING AMENDMENT.—Section 103(e) (as so redesignated by paragraph (1)(A)) is amended by striking "subsection (c)" and inserting "subsection (d)".

[*103x9]  SEC. 103. <8 USC 1103 note> IMPROVED BORDER EQUIPMENT AND TECHNOLOGY.

The Attorney General is authorized to acquire and use, for the purpose of detection, interdiction, and reduction of illegal immigration into the United States, any Federal equipment (including fixed wing aircraft, helicopters, four-wheel drive vehicles, sedans, night vision goggles, night vision scopes, and sensor units) determined available for transfer by any other agency of the Federal Government upon request of the Attorney General.

[*104x9]  SEC. 104. IMPROVEMENT IN BORDER CROSSING IDENTIFICATION CARD.

(a) IN GENERAL.—Section 101(a)(6) (8 U.S.C. 1101(a)(6)) is amended by adding at the end the following: "Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing  [**3009x556]  identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.".

(b) <8 USC 1101 note> EFFECTIVE DATES.—

(1) CLAUSE A.—Clause (A) of the sentence added by the amendment made by subsection (a) shall apply to documents issued on or after 18 months after the date of the enactment of this Act.

(2) CLAUSE B.—Clause (B) of such sentence shall apply to cards presented on or after 3 years after the date of the enactment of this Act.

[*105x9]  SEC. 105. CIVIL PENALTIES FOR ILLEGAL ENTRY.

(a) IN GENERAL.—Section 275 (8 U.S.C. 1325) is amended—

(1) by redesignating subsections (b) and (c) as subsections (c) and (d), respectively; and

(2) by inserting after subsection (a) the following:

"(b) Any alien who is apprehended while entering (or attempting to enter) the United States at a time or place other than as designated by immigration officers shall be subject to a civil penalty of—

**Plaintiffs' Brief in Opposition to Defendants
Motion to Dismiss etc.**


Exhibit "B"

<< 8 USCA § 1158 NOTE >>

(2) The amendments made by subsections (a)(3), (b), (c), and (d) shall take effect on the date of the enactment of this division and shall apply to applications for asylum, withholding, or other relief from removal made on or after such date.

<< 8 USCA § 1252 NOTE >>

(3) The amendment made by subsection (e) shall take effect on the date of the enactment of this division and shall apply *306 to all cases in which the final administrative removal order is or was issued before, on, or after such date.

<< 8 USCA § 1252 NOTE >>

(4) The amendment made by subsection (f) shall take effect on the date of the enactment of this division and shall apply to all cases pending before any court on or after such date.

<< 8 USCA § 1157 NOTE >>

(5) The amendments made by subsection (g) shall take effect on the date of the enactment of this division.

(i) REPEAL.--Section 5403 of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108-458) is repealed.

<< 8 USCA § 1103 NOTE >>

SEC. 102. WAIVER OF LEGAL REQUIREMENTS NECESSARY FOR IMPROVEMENT OF BARRIERS AT BORDERS; FEDERAL COURT REVIEW.

Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) is amended to read as follows:

"(c) WAIVER.--

"(1) IN GENERAL.--Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

"(2) FEDERAL COURT REVIEW.--

  "(A) IN GENERAL.--The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

  "(B) TIME FOR FILING OF COMPLAINT.--Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

  "(C) ABILITY TO SEEK APPELLATE REVIEW.--An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.".

SEC. 103. INADMISSIBILITY DUE TO TERRORIST AND TERRORIST-RELATED ACTIVITIES.

<< 8 USCA § 1182 >>

(a) IN GENERAL.--So much of section 212(a)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Plaintiffs' Brief in Opposition to Defendants
Motion to Dismiss etc.**


Exhibit "C"

PL 109-367, 2006 HR 6061                                                          Page 1
**PL 109-367**, October 26, 2006, 120 Stat 2638
**(Cite as: 120 Stat 2638)**

### UNITED STATES PUBLIC LAWS
### 109th Congress - Second Session
### Convening January 7, 2005

Copr. © 2006 Thomson/West. No Claim to Orig. U.S. Govt.Works

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed
PL 109-367 (HR 6061)
October 26, 2006
SECURE FENCE ACT OF 2006

An Act To establish operational control over the international land and maritime borders of the United States.

Be it enacted by the Senate and House of Representatives of the United States
of America in Congress assembled,
<< 8 USCA § 1101 NOTE >>

SECTION 1. SHORT TITLE.

This Act may be cited as the "Secure Fence Act of 2006".

<< 8 USCA § 1701 NOTE >>
SEC. 2. ACHIEVING OPERATIONAL CONTROL ON THE BORDER.

(a) IN GENERAL.--Not later than 18 months after the date of the enactment of this Act, the Secretary of Homeland Security shall take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States, to include the following--

(1) systematic surveillance of the international land and maritime borders of the United States through more effective use of personnel and technology, such as unmanned aerial vehicles, ground-based sensors, satellites, radar coverage, and cameras; and

(2) physical infrastructure enhancements to prevent unlawful entry by aliens into the United States and facilitate access to the international land and maritime borders by United States Customs and Border Protection, such as additional checkpoints, all weather access roads, and vehicle barriers.

(b) OPERATIONAL CONTROL DEFINED.--In this section, the term "operational control" means the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband.

(c) REPORT.--Not later than one year after the date of the enactment of this Act and annually thereafter, the Secretary shall submit to Congress a report on the progress made toward achieving and maintaining operational control over the entire international land and maritime borders of the United States in accordance with this section.

<< 8 USCA § 1103 NOTE >>
SEC. 3. CONSTRUCTION OF FENCING AND SECURITY IMPROVEMENTS IN BORDER AREA FROM PACIFIC OCEAN TO GULF OF MEXICO.

**PL 109-367**, October 26, 2006, 120 Stat 2638

**(Cite as: 120 Stat 2638)**

Section 102(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104-208; 8 U.S.C. 1103 note) is amended--

**\*2639**

(1) in the subsection heading by striking "Near San Diego, California"; and

(2) by amending paragraph (1) to read as follows:

"(1) SECURITY FEATURES.--

   "(A) REINFORCED FENCING.--In carrying out subsection (a), the Secretary of Homeland Security shall provide for least 2 layers of reinforced fencing, the installation of additional physical barriers, roads, lighting, cameras, and sensors--

   "(i) extending from 10 miles west of the Tecate, California, port of entry to 10 miles east of the Tecate, California, port of entry;

   "(ii) extending from 10 miles west of the Calexico, California, port of entry to 5 miles east of the Douglas, Arizona, port of entry;

   "(iii) extending from 5 miles west of the Columbus, New Mexico, port of entry to 10 miles east of El Paso, Texas;

   "(iv) extending from 5 miles northwest of the Del Rio, Texas, port of entry to 5 miles southeast of the Eagle Pass, Texas, port of entry;  and

   "(v) extending 15 miles northwest of the Laredo, Texas, port of entry to the Brownsville, Texas, port of entry.

   "(B) PRIORITY AREAS.--With respect to the border described--

   "(i) in subparagraph (A)(ii), the Secretary shall ensure that an interlocking surveillance camera system is installed along such area by May 30, 2007, and that fence construction is completed by May 30, 2008;  and

   "(ii) in subparagraph (A)(v), the Secretary shall ensure that fence construction from 15 miles northwest of the Laredo, Texas, port of entry to 15 southeast of the Laredo, Texas, port of entry is completed by December 31, 2008.

   "(C) EXCEPTION.--If the topography of a specific area has an elevation grade that exceeds 10 percent, the Secretary may use other means to secure such area, including the use of surveillance and barrier tools.".

SEC. 4. NORTHERN BORDER STUDY.

(a) IN GENERAL.--The Secretary of Homeland Security shall conduct a study on the feasibility of a state of-the-art infrastructure security system along the northern international land and maritime border of the United States and shall include in the study--

(1) the necessity of implementing such a system;

(2) the feasibility of implementing such a system; and

(3) the economic impact implementing such a system will have along the northern border.

(b) REPORT.--Not later than one year after the date of the enactment of this Act, the Secretary of Homeland Security shall submit to the Committee on Homeland Security of the House of Representatives and the Committee on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**PL 109-367**, October 26, 2006, 120 Stat 2638
**(Cite as: 120 Stat 2638)**

Homeland Security and Governmental Affairs of the Senate a report that contains the results of the study conducted under subsection (a).

**\*2640 SEC. 5. EVALUATION AND REPORT RELATING TO CUSTOMS AUTHORITY TO STOP CERTAIN FLEEING VEHICLES.**

(a) EVALUATION.--Not later than 30 days after the date of the enactment of this Act, the Secretary of Homeland Security shall--

(1) evaluate the authority of personnel of United States Customs and Border Protection to stop vehicles that enter the United States illegally and refuse to stop when ordered to do so by such personnel, compare such Customs authority with the authority of the Coast Guard to stop vessels under section 637 of title 14, United States Code, and make an assessment as to whether such Customs authority should be expanded;

(2) review the equipment and technology available to United States Customs and Border Protection personnel to stop vehicles described in paragraph (1) and make an assessment as to whether or not better equipment or technology is available or should be developed; and

(3) evaluate the training provided to United States Customs and Border Protection personnel to stop vehicles described in paragraph (1).

(b) REPORT.--Not later than 60 days after the date of the enactment of this Act, the Secretary of Homeland Security shall submit to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate a report that contains the results of the evaluation conducted under subsection (a).

Approved October 26, 2006.

LEGISLATIVE HISTORY--H.R. 6061:

CONGRESSIONAL RECORD, Vol. 152 (2006):

Sept. 14, considered and passed House.

Sept. 21, 25, 26, 28, 29, considered and passed Senate.

WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 42 (2006):

Oct. 26, Presidential remarks.

**PL 109-367**, 2006 HR 6061

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## PROOF OF SERVICE

1.  My name is _____. I am over the age of eighteen. I am employed in the State of California, County of _____.

2.  My _____ business _____ residence address is _____ _____.

3.  On _____, _____, I served ____ an original copy ____a true and correct copy of the following documents:_____ _____ _____ _____ _____

4.  I served the documents on the person(s) identified on the attached mailing/service list as follows:

___ *by personal service*.  I personally delivered the documents to the person(s) at the address(es) indicated on the list.

___ *by U.S. mail*.  I sealed the documents in an envelope or package addressed to the person(s) at the address(es) indicated on the list, with first-class postage fully prepaid, and then I

      ___ deposited the envelope/package with the U.S. Postal Service.

      ___ placed the envelope/package in a box for outgoing mail in accordance with my office's ordinary practices for collecting and processing outgoing mail, with which I am readily familiar.  On the same day that mail is placed in the box for outgoing mail, it is deposited in the ordinary course of business with the U.S. Postal Service.

I am a resident of or employed in the county where the mailing occurred.  The mailing occurred in the city of _____, California.

___ *by overnight delivery*.  I sealed the documents in an envelope/package provided by an overnight-delivery service and addressed to the person(s) at the address(es) indicated on the list, and then I placed the envelope/package for collection and overnight delivery in the service's box regularly utilized for receiving items for overnight delivery or at the service's office where such items are accepted for overnight delivery.

___ *by facsimile transmission*.  Based on an agreement of the parties or a court order, I sent the documents to the person(s) at the fax number(s) shown on the list.  Afterward, the fax machine from which the documents were sent reported that they were sent successfully.

___ *by e-mail delivery*.  Based on an agreement of the parties or a court order, I sent the documents to the person(s) at the e-mail address(es) shown on the list.  I did not receive, within a reasonable period of time afterward, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws _____ of the United States _____ of the State of California that the foregoing is true and correct.

Date: _____, _____      Signature: _____

**MAILING LIST**

Save Our Heritage Organisation *et al.*
v.
Alberto R. Gonzalez *et al.*

U.S. District Court case no. 1:07-CV-00308-RCL

Daniel Bensing                                    Attorneys for Federal Defendants
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
E-mail: daniel.bensing@usdoj.gov

Donna S. Fitzgerald                               Attorneys for Federal Defendants
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
E-mail: donna.fitzgerald@usdoj.gov

1  BRIGGS LAW CORPORATION [BLC file: 243.01]
   Cory J. Briggs (DC Bar no. 464923)
2  99 East "C" Street, Suite 111
   Upland, CA 91786
3  Telephone: 909-949-7115

4  Attorney for Plaintiffs Save Our Heritage Organisation
     and Friends of the U.S.-Mexico Border Environment

5

6

7              UNITED STATES DISTRICT COURT

8            FOR THE DISTRICT OF COLUMBIA

9

10 SAVE OUR HERITAGE ORGANISATION and )    CASE NO. 1:07-CV-00308-RCL
   FRIENDS OF THE U.S.-MEXICO BORDER )
11 ENVIRONMENT,                       )
                                      )    **[Proposed]**
12                         Plaintiffs, )   **ORDER DENYING DEFENDANTS'**
                                      )    **MOTION TO DISMISS UNDER**
13          vs.                       )    **FEDERAL RULE OF CIVIL**
                                      )    **PROCEDURE 12(b)(6)**
14 ALBERTO R. GONZALEZ, in his official )
   capacity as Attorney General of the United )   Action Filed: February 9, 2007
15 States; U.S. DEPARTMENT OF JUSTICE; )
   MICHAEL CHERTOFF, in his official capacity )
16 as Secretary of the U.S. DEPARTMENT OF )
   H O M E L A N D   S E C U R I T Y ;   U . S . )
17 DEPARTMENT OF HOMELAND SECURITY; )
   W. RALPH BASHAM, in his official capacity as )
18 Commissioner of the U.S. CUSTOMS AND )
   BORDER PROTECTION; U.S. CUSTOMS )
19 AND BORDER PROTECTION; JULIE L. )
   MYERS, in her official capacity as Assistant )
20 Secretary of Homeland Security for the U.S. )
   I M M I G R A T I O N   A N D   C U S T O M S )
21 ENFORCEMENT; U.S. IMMIGRATION AND )
   CUSTOMS  ENFORCEMENT;  EMILIO  T. )
22 GONZALES, in his official capacity as Director )
   o f   t h e   U . S .   C I T I Z E N S H I P   A N D )
23 IMMIGRATION  SERVICES;  and  U.S. )
   CITIZENSHIP   AND   IMMIGRATION )
24 SERVICES,                          )
                                      )
25                        Defendants.  )

26

27      With the Court having considered the motion to dismiss filed by Defendants under Rule

28 12(b)(6) of the Federal Rules of Civil Procedure against all claims alleged in Plaintiffs'

Complaint for Declaratory and Injunctive Relief for Violations of Federal Law filed on February 9, 2007, including consideration of all briefs and other materials submitted in support of and in opposition to the motion,

IT IS NOW ORDERED that the motion to dismiss is denied in its entirety.


Date:_____        _____

Judge, U.S. District Court

1  BRIGGS LAW CORPORATION [BLC file: 243.01]
   Cory J. Briggs (DC Bar no. 464923)
2  99 East "C" Street, Suite 111
   Upland, CA 91786
3  Telephone: 909-949-7115

4  Attorney for Plaintiffs Save Our Heritage Organisation
     and Friends of the U.S.-Mexico Border Environment

5

6

7               UNITED STATES DISTRICT COURT

8             FOR THE DISTRICT OF COLUMBIA

9

10  SAVE OUR HERITAGE ORGANISATION and )   CASE NO. 1:07-CV-00308-RCL
    FRIENDS OF THE U.S.-MEXICO BORDER )
11  ENVIRONMENT,                      )
                                      )   PLAINTIFFS' REQUEST FOR
12                     Plaintiffs,    )   JUDICIAL NOTICE IN
                                      )   OPPOSITION TO DEFENDANTS'
13         vs.                        )   MOTION TO DISMISS UNDER
                                      )   FEDERAL RULE OF CIVIL
14  ALBERTO R. GONZALEZ, in his official )   PROCEDURE 12(b)(6)
    capacity as Attorney General of the United )
15  States; U.S. DEPARTMENT OF JUSTICE; )   Action Filed: February 9, 2007
    MICHAEL CHERTOFF, in his official capacity )
16  as Secretary of the U.S. DEPARTMENT OF )
    H O M E L A N D   S E C U R I T Y ;   U . S . )   ** Oral Argument Requested **
17  DEPARTMENT OF HOMELAND SECURITY; )
    W. RALPH BASHAM, in his official capacity as )
18  Commissioner of the U.S. CUSTOMS AND )
    BORDER PROTECTION; U.S. CUSTOMS )
19  AND BORDER PROTECTION; JULIE L. )
    MYERS, in her official capacity as Assistant )
20  Secretary of Homeland Security for the U.S. )
    I M M I G R A T I O N   A N D   C U S T O M S )
21  ENFORCEMENT; U.S. IMMIGRATION AND )
    CUSTOMS ENFORCEMENT; EMILIO T. )
22  GONZALES, in his official capacity as Director )
    of   the   U.S.   CITIZENSHIP   AND )
23  IMMIGRATION   SERVICES;   and   U.S. )
    CITIZENSHIP   AND   IMMIGRATION )
24  SERVICES,                         )
                                      )
25  _____ )
                       Defendants.    )

26        Plaintiffs Save Our Heritage Organisation and Friends of the U.S.-Mexico Border

27  Environment respectfully submit this request for judicial notice in opposition to the motion to

28  dismiss filed by Defendants under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

1    <u>Legal and Procedural Basis for Request</u>: The Court shall take judicial notice of

2    adjudicative facts if requested to do so by a party and if supplied with the necessary information.

3    FED. R. EVID. 201(d).  Facts subject to judicial notice are those that are either (*i*) generally

4    known within the territorial jurisdiction of the Court or (*ii*) capable of accurate and ready

5    determination by resort to sources whose accuracy cannot reasonably be questioned.  FED. R.

6    EVID. 201(b).  Judicial notice may be taken at any time during a proceeding.  FED. R. EVID.

7    201(f).  Indeed, absent a timely request for judicial notice, a request may even be made after

8    judicial notice has been taken.  FED. R. EVID. 201(e).

9    <u>Facts to Be Judicially Noticed</u>: Plaintiff requests that the Court take judicial notice of the

10   following facts: (*i*) the point that is 10 miles west of the Tecate, California port of entry

11   identified in Pub. L. 109-367, 120 Stat. 2638-2639 (8 U.S.C.A. § 1103 note), is more than 14

12   miles east of the point along the international land border between the United States and Mexico

13   starting at the Pacific Ocean, as described in Pub. L. 104-208, 110 Stat. 3009-554; and (*ii*) the

14   Tecate, California port of entry is closer to the Pacific Ocean than is the Calexico, California

15   port of entry, as described in Pub. L. 109-367, 120 Stat. 2638-2639 (8 U.S.C.A. § 1103 note).

16   Items 1 and 2 hereto are provided for the Court's convenience in determining the relative

17   locations of the City of San Diego, California, the Tecate, California port of entry, and the

18   Calexico, California port of entry.

19        I declare under penalty of perjury under the laws of the United States that Items 1 and

20   2 attached hereto are true and correct copies of what they purport to be.

21
22        Date: May 7, 2007.            Respectfully submitted,
23                                      BRIGGS LAW CORPORATION
24                          By:    ____/s/_____
25                                 Cory J. Briggs
26                                 Attorney for Plaintiffs Save Our Heritage
27                                 Organisation and Friends of the U.S.-
                                   Mexico Border Environment
28

**Plaintiffs' Request for Judicial Notice in Opposition to
Defendants' Motion to Dismiss etc.**

Item 1



**Sorry!** When printing directly from the browser your map may be incorrectly cropped. To print the entire map, try clicking the **"Printer-Friendly"** link at the top of your results page.





**START** San Diego, CA US          **END** Tecate, CA US

**Total Est. Time:**                **Total Est. Distance:**
45 minutes                          39.49 miles

| Maneuvers | | Distance |
|---|---|---|
| **START** | **1:** Start out going NORTH on 9TH AVE toward BROADWAY. | <0.1 miles |
| | **2:** Turn RIGHT onto BROADWAY. | <0.1 miles |
| | **3:** Turn RIGHT onto 10TH AVE. | 0.2 miles |
| | **4:** Turn LEFT onto G ST. | 0.4 miles |
| EAST 94 | **5:** Merge onto CA-94 E. | 13.3 miles |
| | **6:** Turn RIGHT onto CAMPO RD / CA-94. | 23.6 miles |
| | **7:** Turn RIGHT onto TECATE RD / CA-188. | 1.7 miles |
| **END** | **8:** End at **Tecate, CA US** | |

**Total Est. Time:** 45 minutes      **Total Est. Distance:** 39.49 miles

**Sorry!** When printing directly from the browser your map may be incorrectly cropped. To print the entire map, try clicking the **"Printer-Friendly"** link at the top of your results page.



All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

**Plaintiffs' Request for Judicial Notice in Opposition to
Defendants' Motion to Dismiss etc.**

Item 2



**Sorry!** When printing directly from the browser your map may be incorrectly cropped. To print the entire map, try clicking the **"Printer-Friendly"** link at the top of your results page.



 **San Diego, CA US**           **Calexico, CA US**

**Total Est. Time:**                    **Total Est. Distance:**
1 hour, 52 minutes                      121.79 miles

| Maneuvers | Distance |
|---|---|
| **START** **1:** Start out going NORTH on 9TH AVE toward BROADWAY. | <0.1 miles |
| **2:** Turn RIGHT onto BROADWAY. | <0.1 miles |
| **3:** Turn RIGHT onto 10TH AVE. | 0.2 miles |
| **4:** Turn LEFT onto G ST. | 0.4 miles |
| **5:** Merge onto CA-94 E. | 8.2 miles |
| **6:** Keep LEFT to take CA-125 N. | 2.2 miles |
| **7:** Merge onto I-8 E. | 103.8 miles |
| **8:** Merge onto CA-111 S via EXIT 118A toward CALEXICO. | 6.7 miles |
| **9:** Turn LEFT onto E BIRCH ST / CA-98. | <0.1 miles |
| **END** **10:** End at **Calexico, CA US** | |

**Total Est. Time:** 1 hour, 52 minutes          **Total Est. Distance:** 121.79 miles

Case 1:07-cv-00308-RCL    Document 7-3    Filed 05/07/2007    Page 8 of 10

**Sorry!** When printing directly from the browser your map may be incorrectly cropped. To print the entire map, try clicking the **"Printer-Friendly"** link at the top of your results page.



All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

# PROOF OF SERVICE

1.    My name is _____.  I am over the age of eighteen.  I am employed in the State of California, County of _____.

2.    My _____ business _____ residence address is _____ _____.

3.    On _____, _____, I served _____ an original copy _____a true and correct copy of the following documents:_____ _____ _____ _____ _____

4.    I served the documents on the person(s) identified on the attached mailing/service list as follows:

___ *by personal service*.  I personally delivered the documents to the person(s) at the address(es) indicated on the list.

___ *by U.S. mail*.  I sealed the documents in an envelope or package addressed to the person(s) at the address(es) indicated on the list, with first-class postage fully prepaid, and then I

        ___ deposited the envelope/package with the U.S. Postal Service

        ___ placed the envelope/package in a box for outgoing mail in accordance with my office's ordinary practices for collecting and processing outgoing mail, with which I am readily familiar.  On the same day that mail is placed in the box for outgoing mail, it is deposited in the ordinary course of business with the U.S. Postal Service.

I am a resident of or employed in the county where the mailing occurred.  The mailing occurred in the city of _____, California.

___ *by overnight delivery*.  I sealed the documents in an envelope/package provided by an overnight-delivery service and addressed to the person(s) at the address(es) indicated on the list, and then I placed the envelope/package for collection and overnight delivery in the service's box regularly utilized for receiving items for overnight delivery or at the service's office where such items are accepted for overnight delivery.

___ *by facsimile transmission*.  Based on an agreement of the parties or a court order, I sent the documents to the person(s) at the fax number(s) shown on the list.  Afterward, the fax machine from which the documents were sent reported that they were sent successfully.

___ *by e-mail delivery*.  Based on an agreement of the parties or a court order, I sent the documents to the person(s) at the e-mail address(es) shown on the list.  I did not receive, within a reasonable period of time afterward, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws _____ of the United States __ ___ of the State of California that the foregoing is true and correct.

Date: _____, _____      Signature: _____

**MAILING LIST**

Save Our Heritage Organisation *et al.*
v.
Alberto R. Gonzalez *et al.*

U.S. District Court case no. 1:07-CV-00308-RCL

---

Daniel Bensing
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
E-mail: daniel.bensing@usdoj.gov

Donna S. Fitzgerald
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
E-mail: donna.fitzgerald@usdoj.gov

Attorneys for Federal Defendants

Attorneys for Federal Defendants