UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAVE OUR HERITAGE ORGANIZATION and FRIENDS OF THE U.S.-MEXICO BORDER ENVIRONMENT, <br><br>    Plaintiffs, <br><br>    v. <br><br>ALBERTO R. GONZALEZ, U.S. DEPT. OF JUSTICE, MICHAEL CHERTOFF, U.S. DEPT. OF HOMELAND SECURITY, W. RALPH BASHAM, U.S. CUSTOMS AND BORDER PROTECTION, JULIE L. MEYERS, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, EMILIO T. GONZALES, and U.S. CITIZENSHIP AND IMMIGRATION SERVICES, <br><br>    Defendants. | Case No. 1:07-cv-00308-RCL |

**REPLY MEMORANDUM
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Contrary to plaintiffs' assertion, the Secure Fence Act of 2006 did not withdraw authorization for the construction of the San Diego barrier. That Act's amendment to section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 left unchanged section 102(a), which specifically authorizes the Secretary of Homeland Security (DHS) to "take such actions as may be necessary to install additional physical barriers and roads in the vicinity of the United States Border to deter illegal crossings." § 102(a). Accordingly, the Secure Fence Act did nothing to revive plaintiffs' previously time-barred claims relating to the San Diego

barrier.

Plaintiffs are also incorrect in their interpretation of the Supreme Court's Delegation Doctrine jurisprudence, as the waiver legislation contains the required "intelligible principle," Whitman v. American Trucking Ass'n, 531 U.S. 437, 472 (2001), to guide the exercise of discretion by DHS. The Court has repeatedly noted that it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." Id. at 474-75. Finally, plaintiffs offer no basis for distinguishing this case from Sierra Club v. Ashcroft, (S.D. Cal. 04-CV-272LAB (JMA), the only case to consider this issue, which rejected an identical delegation doctrine challenge to one of the two projects challenged in this action.

## ARGUMENT

**I.    The Secure Fence Act of 2006 Neither Affects DHS' Authority to Construct the San Diego Barrier nor Revives Plaintiffs' Time-Barred Claims**

Plaintiffs advance the novel argument that because the most current version of section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, (IIRIRA) 8 U.S.C. § 1103 (note), no longer specifically mentions construction of the San Diego barrier, any authorization for this project has been withdrawn by Congress, sub silencio. Relying on Congress' sub silencio withdrawal of authority, plaintiffs further assert that their claims related to the San Diego barrier are therefore no longer subject to the 60-day statute of limitations set forth in Section 102(c)(B)(2). Plaintiffs' Opposition (Opposition) at 6-7. Neither argument can be sustained.

With respect to plaintiffs' "interpretation" of the Secure Fence Act, plaintiffs ignore the fact that DHS derives its authority to construct all barriers and roads, including the San Diego

barrier, from Section 102(a) of IIRIRA, which states, in relevant part, that the Secretary "shall take such actions as may be necessary to install additional physical barriers and roads in the vicinity of the United States Border to deter illegal crossings." In turn, Section 102(b) of IIRIRA merely identifies five border sections where Congress has specifically directed DHS to exercise the authority granted under Section 102(a). In both the original and amended versions of IIRIRA, Section 102(b)(1) states: "In carrying out *subsection (a)*, . . ." (emphasis added). Thus, section 102(a) confers broad authority on the Secretary of DHS to construct barriers and roads wherever he finds such barriers are needed to "deter illegal crossings." The authority under Section 102(a) exists independent of the specific Congressional <u>mandates</u> for barriers in certain areas identified in section 102(b).

A review of other legislative developments in this area demonstrates a growing Congressional desire to enhance the authority of DHS to construct barriers along our borders to reduce illegal immigration. For example, when Congress passed IIRIRA in 1996, it specifically identified only the San Diego barrier and provided the Attorney General with limited waiver authority. P.L. 104-208. In 2005, with the REAL ID Act, Congress greatly expanded the waiver authority in Section 102(c). P.L, 109-13, 119 Stat. 231, 302, 306. One year later, Congress amended the statute again by specifically identifying five additional barriers it wanted constructed on the Southern border. P.L. 109-367. With Congress thus granting DHS increasingly expansive authority to deal with the problem of illegal immigration, and also directing that such authority be exercised to include specific sites, it would be counterintuitive to construe section 102 as withdrawing the authority to construct the first barrier at a time when it has been nearly completed.

Moreover, extensive legislative history of section 102, as well as related legislative

actions, reinforces this point.  For example, during the debate over whether to direct DHS to build additional barriers and roads in Arizona, Texas, and New Mexico, members of Congress commented that "[u]nder current law, the Department of Homeland Security already has the legal authority to build the fences that it needs," and the Secure Fence Act merely "mandates specifically where DHS must build fencing."   109 Cong. Rec. S10614 (daily ed. September 29, 2006) (statement of Sen. Bingaman); see also 109 Cong. Rec. S10615 (daily ed. September 29, 2006) (statement of Sen. Reid) ("The Department of Homeland Security already has the authority to build fences along our border.  This amendment is unnecessary.").

      Indeed, the legislative history of the Secure Fence Act indicates that at least some members of Congress stated that the *success* of the San Diego barrier in preventing illegal entry was the reason they were calling for a more extensive system of barriers along the Southern border.  In one of the floor debates concerning the Secure Fence Act, Representative King of New York, who was at the time the Chairman of the House Homeland Security Committee, stated that "just a 14-mile fence in San Diego has brought about a significant decrease in crime." 109 Cong. Rec. H6583 (daily ed. September 14, 2006) (statement of Rep. King).

      That Congress contemplated the completion of the San Diego barrier is further reinforced by another clause of the Secure Fence Act.  Section 3 of the Act is entitled: "CONSTRUCTION OF FENCING AND SECURITY IMPROVEMENTS IN THE BORDER AREA FROM ***PACIFIC OCEAN*** TO GULF OF MEXICO."   Public Law 109-367, Sec. 3 (emphasis added).  Obviously, the San Diego barrier, which starts at the Pacific Ocean and goes east 14 miles, is thus encompassed within the revised description.  Congress, therefore, contemplated completion of the San Diego barrier.  In light of this change, it is clear that plaintiffs misunderstand the relevance of Congress' amendment of the title of Section 102(b) from "FENCING AND ROAD

IMPROVEMENTS IN THE BORDER AREA NEAR SAN DIEGO, CALIFORNIA" to simply "FENCING AND ROAD IMPROVEMENTS IN THE BORDER AREA." Opposition at 6. This does not show that Congress was withdrawing the authorization for the San Diego barrier. Instead, the change merely indicates that with the addition of five new, Congressionally-mandated barriers, the section addresses a much broader geographic area.

It is especially significant that just one month prior to passing the Secure Fence Act, Congress appropriated over 30 million dollars for construction of the San Diego barrier.[1] See H.R. Conf. Rep. No. 699, 109 Cong., 2nd Sess. (2006) (". . . within the total provided, $30,500,000 is provided for the San Diego Border Infrastructure System . . ."). It is well established that statutes in pari materia should be construed together, Allen v. Grand Central Aircraft, 347 U.S. 535, 541-42 (1954), particularly where they are the product of the same session of the legislature, Erlenbaugh v. U.S., 409 U.S. 239, 244 (1972). Therefore, it is reasonable to conclude that Congress would not be providing $30 million to fund a project at the same time that it was withdrawing the authorization for the very same project

Additionally, plaintiffs' interpretation of the Secure Fence Act violates the "cardinal principle of statutory construction that repeals by implication are not favored." United States v. United Continental Tuna Corp., 425 U.S. 164, 168 (1976). The Supreme Court has stated that where such a "repeal" involves the "compromise of previously articulated policies," one should

---

[1] Plaintiffs clearly misapprehend the nature of the $12 million figure that is set forth in Section 102(b)(4). Opposition at 7. Section 102(b)(4) is a mere *authorization.* An authorization does not actually appropriate any funds, but rather contemplates subsequent legislation by Congress appropriating funds to implement a particular piece of legislation. See 67 Comp. Gen. 332 (1988); 16 Comp. Gen. 1007, 1008 (1937); United States Government Accountability Office, Principles of Federal Appropriations Law, 2-40 (3rd ed., 2004). An authorization is essentially a directive to Congress itself, which Congress is free to follow or alter in a subsequent appropriation act.
.

5

"normally expect some expression by Congress that such results are intended." Id. Plaintiffs have identified no such "expression" in the Secure Fence Act.

Plaintiffs are not only wrong in their assertion that the Secure Fence Act withdrew DHS' authorization to continue construction on the San Diego barrier, they are also wrong to suggest that the Secure Fence Act had any effect on the validity of the previously exercised waiver or that the Act somehow revived their time-barred claims. In fact, according to relevant Supreme Court precedent, no such retroactive effect can be read into the Act. In Landgraf v. USI Film Products, the Supreme Court set out a three-step test for determining whether to give a statute retroactive application. 511 U.S. 244, 262 (1994). The Court stated:

> When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *I. e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

Clearly, no such "congressional intent" is expressed in the language of the Secure Fence Act.

Even if the deletion of a specific reference to the San Diego barrier from section 102 created an ambiguity as to whether Congress wanted that project to be completed, it is DHS's interpretation of the statute, and not the plaintiffs, that should control. In the seminal case of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the Supreme Court held that where the statute is ambiguous, the issue is whether the agency has adopted a "permissible construction of the statute." 467 U.S. at 843. Thus, under Chevron, an agency's interpretation of a statute Congress has entrusted it to administer is entitled to deference as long as it is a reasonable construction and not precluded by an unambiguous statutory command to the contrary. See also Shalala v. Illinois Council on Long Term Care,

Inc., 529 U.S. 1 (2000). As demonstrated above, DHS' interpretation of the Secure Fence Act is reasonable and a permissible construction of the Act, and is not precluded by any unambiguous command from Congress, and hence, DHS' interpretation is entitled to judicial deference.

## II.     Plaintiffs Cannot Rely on the APA, As it Has Been Waived

In addition to their argument that the San Diego barrier is unauthorized, plaintiffs also attempt to rely on a claim under the Administrative Procedure Act (APA) to avoid section 102(c)(2)(B)'s 60-day statute of limitations. But, as permitted by section 102(c), the Secretary waived the applicability of the APA to these activities, 70 Fed. Reg. 55,622 (September 22, 2005), and hence plaintiffs cannot rely on that statute and its associated six year statute of limitations to save their time-barred challenge. Plaintiffs' attempt to utilize the APA also ignores the fact that, at bottom, this case is about the waiver authority granted to the Secretary by Congress, for which Congress provided an express jurisdictional provision in section 102(c) of IIRIRA. Congress simply could not have intended for parties to render the time limits in section 102(c) meaningless by invoking jurisdiction under the APA.

## III.    The Authority Congress Granted to DHS to Construct Border Barriers Under Section 102 Provides The "Intelligible Principle" Required for a Lawful Delegation

Plaintiffs' confusion about the scope of the Delegation Doctrine is evident from the very outset of their discussion where they assert that the "controlling authorities" for Delegation Doctrine purposes are Panama Refining Co. v. Ryan, 293 U.S. 388 (1935) and A.L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495 (1935). Opposition at 11. In fact, since these two Supreme Court decisions, the Court has never sustained a Delegation Doctrine challenge. Moreover, the expansive reasoning of Panama Refining and Schecter has been largely repudiated by later decisions of the Court. See Loving v. United States, 517 U.S. 748, at 771-72 (1996)

("Though in 1935 we struck down two delegations for lack of an intelligible principle, . . . we have since upheld, without exception, delegations under standards phrased in sweeping terms.). Nor do plaintiffs offer any coherent basis for distinguishing Sierra Club v. Ashcroft (Attachment A to Motion to Dismiss), which sustained the constitutionality of the San Diego Waiver against an identical delegation doctrine challenge. Opposition at 24-24.

All that is required for a lawful delegation of authority to an administrative agency is the articulation of "an intelligible principle to which the person or body authorized to [act] is directed to conform." J.W. Hampton, Jr. Co. v. United States, 276 U.S. 394, 409 (1928). In Whitman v. American Trucking Assoc., 531 U.S. 457 (2001), the Court's most recent Delegation Doctrine case, it reviewed the numerous cases upholding the most sweeping of statutory delegations (e.g. "fair and equitable," "public interest") and reiterated that "we have 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" Id. at 474-75, quoting Mistretta v. United States, 488 U.S. 361, 416 (1989), (SCALIA, J., dissenting); see also Nat'l Federation of Fed. Employees v. United States, 905 F.2d 400, 404 (D.C.Cir. 1990) ("The 'intelligible principle' test has not been a tough one."); Sierra Club v. Ashcroft, Defendants' Exhibit A at 7-11.

Plaintiffs' are also mistaken in their conclusion that the only portion of section 102 that guides the Secretary's exercise of the delegated waiver authority is the language authorizing the Secretary to utilize that authority when it is "necessary to ensure expeditious construction of the barriers and roads under this section." See e.g. Opposition at 16, citing § 102(c)(1). This authority must be read in conjunction with the provisions of section 102 which grant DHS authority to "take such actions as may be necessary to install additional physical barriers and

roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to <u>deter illegal crossings in areas of high illegal entry</u> into the United States." § 102(a) (emphasis added). Thus, section 102 does not simply authorize waivers whenever the Secretary of DHS concludes it would promote "expeditious construction" of some barrier, somewhere, as plaintiffs suggest. Rather, the statute delegates authority to issue a waiver when DHS determines that it is necessary to expeditiously construct a barrier in an area with high illegal entry where such barrier would deter illegal crossings. These constraints operate to limit the Secretary's authority to a discrete area, under defined circumstances, and for a specific purpose. This, surely, is a sufficiently intelligible principal under the Delegation Doctrine.

A review of statutory delegations that have been affirmed by the Supreme Court demonstrates that section 102 does not run afoul of the intelligible principle test. For example, the Supreme Court has upheld as constitutional statutes that granted the FCC and ICC the authority to promulgate regulations in accordance with their views of the "public interest." <u>National Broad. Co. v. United States</u>, 319 U.S. 190 (1943) (FCC); <u>New York Central Securities Corp. V. United States</u>, 287 U.S. 12 (1932) (ICC). Likewise, a statute was upheld that granted an agency the authority to fix commodity prices that "in [the Administrator's] judgment will be generally fair and equitable and will effectuate the purposes of this Act" to stabilize prices and avert speculation. <u>Yakus v. United States</u>, 321 U.S. 414, 420, 424-27 (1944). <u>See</u> <u>also</u> <u>Lichter v. United States</u>, 334 U.S. 742 (1948) (upholding grant of authority to recoup "excess profits" without statutory direction as to how much profit was too much); <u>American Power & Light Co. v. SEC</u>, 329 U.S. 90 (1946) (upholding grant of authority to SEC to modify holding company structures to ensure they are not "unduly or unnecessarily complicate[d]" and do not "unfairly or

inequitably distribute voting power among security holders"); <u>FPC v. Hope Natural Gas Co.</u>, 320 U.S. 591 (1944) (upholding grant of authority to FPC to determine "just and reasonable" rates); <u>American Trucking</u>, 531 U.S. at 472-75 (upholding grant of authority to EPA to set air quality standards that "allowing an adequate margin of safety, are requisite to protect the public health").

Plaintiffs assert that because the exercise of the delegated authority by EPA sustained in <u>American Trucking</u> was based in part on air quality data, the Delegation Doctrine requires that determinations be made on the basis of "*objective* data." Opposition at 17, (emphasis in original) Of course, no Supreme Court decision has ever added an "objective data" requirement to the "intelligible principle" standard. In fact, in <u>American Trucking</u>, the Supreme Court specifically stated that:

> [E]ven in sweeping regulatory schemes we have never demanded . . . that statutes provide a "determinate criterion" for saying "how much [of the regulated harm] is too much." . . . We did not require the statute to decree how "imminent" was too imminent, or how "necessary" was necessary enough, or even . . . how "hazardous" was too hazardous.

531 U.S. at 475 (internal citations omitted). Clearly, then, the constitutionality of the section 102 waiver authority is not impacted by the presence or absence of so-called "objective data."

Plaintiffs' Opposition fails to offer any meaningful rejoinder to the Supreme Court's holdings that the "same limitations on delegation do not apply 'where the entity exercising the delegated authority itself possesses independent authority over the subject matter.'" <u>Loving</u>, supra, 517 U.S. at 772. It cannot be disputed that the Executive branch has significant independent authority over immigration policy, <u>Knauff v. Shaughnessy</u>, 338 U.S. 537, 542-43 (1950), particularly to secure our borders by excluding aliens. Defendants' authorities cannot be

ignored because, as plaintiffs suggest, "they deal with federal powers assigned to the Executive Branch alone." Opposition at 22-23.  While the Executive Branch has primary responsibility for foreign affairs and the military, Congress has legislative authority over these subjects as well. See Art. I, § 8 (enumerated powers, including to "regulate Commerce with foreign Nations . . . establish an uniform Rule of Naturalization . . .[and] make Rules for the . . . land and naval Forces. . ."). Nor, in dealing with a shared power, is it relevant, as plaintiffs contend, that the delegated authority is being exercised on the border, rather than in a foreign country. Opposition at 23-24.

    Plaintiffs also suggest it is unprecedented that section 102 authorizes DHS to waive any legal requirement that would interfere with the expeditious construction of a required barrier. Opposition at 19-20.  That distinction is irrelevant for Delegation Doctrine purposes; so long as the delegation contains an intelligible principle, it is not unconstitutional. Moreover, in comparison to other delegations that have been affirmed, such as the authorization to issue an elaborate regulatory code to govern an entire industry, e.g. National Broad. Co., supra 319 U.S. 190, the authority granted DHS is comparatively modest as it is limited to the waiver of laws only as they apply to discrete, one-time projects, located on the border.

    Indeed, much of plaintiffs' argument consists of assertions and observations that are simply irrelevant to the Delegation Doctrine analysis.  So, for example, questions about why the construction of the San Diego barrier will evidently take considerably longer than the Yuma barrier, Opposition at 18, at best relate to the exercise of administrative discretion by DHS in administering section 102, but it does not bear on whether the statute contains an "intelligible principle." And the fact that DHS has construed its waiver authority to also include the "upkeep" of these barriers, see Opposition at 18-19, is both a reasonable interpretation of section

11

102, see Chevron, supra, and, again, irrelevant to Delegation Doctrine concerns.

Finally, plaintiffs' only attempt to distinguish Sierra Club v. Ashcroft hinges on the fact that the plaintiffs in that case only alleged a violation of the National Environmental Policy Act, (NEPA), a statute expressly identified by Congress as one which could be waived if necessary to promote the construction of a barrier.  See Opposition at 24-25.  But this is a distinction without a difference.  First, the San Diego Waiver affirmed in Sierra Club encompassed seven statutes in addition to NEPA.  Second, the Sierra Club Court never suggested that the limited scope of the challenge in that case was significant to its holding. In commenting on the broader waiver language enacted in 2005, the Court noted with approval that "Congress simply broadened the scope of the waiver authority of the pre-existing delegation to 'all laws,' but again only for the narrow purpose of expeditious completion of the Triple Fence authorized by the IIRIRA." Defendant's Exhibit at 8 at 8:22-24.

Ultimately, the Delegation Doctrine does not require a high degree of specificity but instead recognizes as a "practical understanding" that "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives."  Mistretta, supra 488 U.S. at 372.  It is, therefore, "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority."  Id. at 372 (citing American Power and Light Co. v. Securities and Exchange Comm'n, 329 U.S. 90, 105 (1946)).  Accord Milk Industry Found., 132 F.3d 1467, 1473 (D.C. Cir. 1998) ("it has become widely accepted that Congress may, as a general matter, confer substantial authority upon a coordinate branch of government, as long as it provides an 'intelligible principle' to guide the delegatee's exercise of the power conferred").  The Section 102 authority for DHS to waive

certain legislation when necessary to ensure the "expeditious construction of . . . barriers" necessary to "deter illegal crossings in areas of high illegal entry" contains a sufficiently intelligible principle to survive constitutional scrutiny. Plaintiffs' complaint should therefore be dismissed.[2]

DATED: May 21, 2007

KENNETH WAINSTEIN
United States Attorney

PETER D. KEISLER
Assistant Attorney Genera

KELLY A. JOHNSON
Acting Assistant Attorney General

CARL NICHOLS
Deputy Assistant Attorney General

SANDRA M. SCHRAIBMAN
Assistant Director
D.C. Bar No. 188599


/s/_____
DANIEL BENSING
D.C. Bar No. 334268
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Tel: (202) 305-06930; Fax: (202) 616-8460
Email: Daniel.Bensing@USDOJ.gov

OF COUNSEL:

Chris Shaw
Office of the Assistant Chief Counsel

DONNA S. FITZGERALD
Connecticut Bar No. 411810
Trial Attorney

---

[2] Defendants do not object to plaintiffs' Request to Take Judicial Notice.  Defendants do not object to plaintiffs' Amended Complaint, so long as defendants' Motion to Dismiss is construed as applying to that Amended Complaint.  Defendants do not object to plaintiffs' request for oral argument but due to pre-existing commitments of counsel, ask that argument be held after June 26, 2007.

| | |
|---|---|
| United States Customs and<br>   Border Protection<br>Department of Homeland Security | United States Department of Justice<br>Environment & Natural Resources Division<br>Natural Resources Section<br>P.O. Box 663<br>Washington D.C. 20044-0663<br>Tel: (202) 305-0476; Fax: (202) 353-7763 |

<u>Certificate of Service</u>

I hereby certify that on this 21st day of May, 2007, I electronically filed the foregoing Federal Defendants' Opposition to Motion to Amend with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel for plaintiffs:

>Cory J. Briggs
>Briggs Law Corporation
>99 East "C" St., Suite 111
>Upland, Cal. 91786

>/s/
>DANIEL BENSING